# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

JORGE CASANOVA

                  Plaintiff

v.                                             CIV 08-0288 BB/CG

ROBERT ULIBARRI, Warden,
CENTRAL NEW MEXICO CORRECTIONS
DEPARTMENT,
JOSE ROMERO, Former Warden,
RAY GARCIA, Correction Officer,

                  Defendants.

## – AND –

JORGE CASANOVA,

                  Plaintiff,

v.                                             CIV 09-1121 BB/CG

CENTRAL NEW MEXICO CORRECTIONS
DEPARTMENT, CNMCF Los Lunas Prison,
JOSE ROMERO, Former Warden, and
RAY GARCIA, Correction Officer,

                  Defendants.

## <u>PROPOSED ORDER AND RECOMMENDED DISPOSITION</u>

**THIS MATTER** is before the Court upon Plaintiff Jorge Casanova's *Civil Rights Complaint Pursuant to 42 U.S.C. § 1983*, (Doc. 1), filed in 08-cv-288, Plaintiff's *Civil Rights Complaint Pursuant to 42 U.S.C. § 1983*, (Doc. 1), filed in 09-cv-1121, *Defendant's Court Ordered Martinez Report*, ('*Martinez* report') (Doc. 51), Plaintiff's *Response to Defendant's*

*Court Ordered Martinez Report*, ('Response') (Doc. 53), and *Defendant's Reply to Plaintiff's Response to the Court Ordered Martinez Report*, ('Reply') (Doc. 54).[1] Casanova alleges that his constitutional rights were violated when Warden Ulibarri placed him in segregation and restricted his access to necessary medication and medical equipment. (Doc. 1 at 2). Casanova also alleges that he was subjected to unnecessarily intrusive body cavity searches by Officer Ray Garcia, and that the Central New Mexico Correctional Facility at Los Lunas ('CNMCF') failed to train and supervise their staff to prevent such abuses. (Civ. 09-1121, Doc. 1 at 3, 5-6, 8-9). Casanova also claims that Warden Jose Romero failed to protect Plaintiff from Officer Garcia's searches, and that he arbitrarily deprived Casanova of his hearing aid. (*Id.* at 3, 6-7, 9). The Court construes Defendants' *Martinez* report as a motion for summary judgment in which Defendants ask the court to dismiss all of Casanova's claims based on his failure to exhaust administrative remedies, his failure to comply with New Mexico's statute of limitations, and his inability to show that his constitutional rights were violated. (Doc. 51 at 4-9). The Court, having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, **RECOMMENDS** that Defendants' motion be **GRANTED IN PART AND DENIED IN PART**.

I.    **Background**

      a.    **Plaintiff's Treatment at CNMCF**

      Plaintiff was incarcerated at CNMCF in Los Lunas, New Mexico, between February,

---

[1] Plaintiff has filed two lawsuits - Civ. 08-288 ('Casanova I'); Civ. 09-1121 ('Casanova II') - against various defendants associated with the Central New Mexico Correctional Facility at Los Lunas. Pursuant to Proposed Findings by this Court, United States District Judge Bruce D. Black consolidated both cases and directed that all filings be made in the earliest filed case - Civ. 08-255. (*See* Civ. 08-288, Doc. 36 at 2; Civ. 09-1121, Doc. 8 at 2). Unless otherwise noted, all further references to docket numbers will correspond with the docket entries for Civ. 08-288.

2002, and March of 2007. (Doc. 51 at 36-37). On three separate occasions between April 25-27, 2004, Plaintiff claims that Officer Ray Garcia subjected him to intrusive body searches following prison visits. (Civ. 09-1121, Doc. 1 at 8-10). Plaintiff claims that Officer Garcia groped Plaintiff's genitals and unnecessarily probed his body cavities during these searches. (*Id.*). Plaintiff filed several grievances relating to these intrusive searches. (*Id.* at 37-44; Doc. 53-19 at 4-8). Plaintiff claims that he complained to Warden Romero about Officer Garcia's repeated inappropriate searches but that Warden Romero did not discipline Officer Garcia. (Doc. 53-19 at 3, 6-7, 9). As a result of the inappropriate searches, Warden Romero purportedly banned Officer Garcia from entering the Geriatric Unit of CNMCF, where Casanova was being held. (Doc. 53-3 at 2, affidavit of inmate Jose Vazquez, ("Romero didn't do anything like always with the Geriatrics inmates, only he didn't allow [Officer Garcia] don't go anymore to Geriatrics Unit.")).

In June of 2005, a contractor for CNCMF took possession of Casanova's expensive hearing aid so that the hearing aid could be repaired. (Civ. 09-1121, Doc. 1 at 6-7, 25). Casanova claims that the hearing aid was never returned to him. (*Id.* at 6-7). Casanova and his attorney wrote numerous complaints to CNMCF and Warden Romero about the missing hearing aid, but the hearing aid was still not returned. (*Id.* at 26-35). A second hearing aid was taken from him at some unspecified time in 2005 and never returned. (*Id.* at 28-29). Casanova claims that, as a result of his hearing aids being taken, he was effectively deaf and unable to hear for the last 3 years of his incarceration at CNMCF. (*Id.* at 7 ("[F]or NEAR 3 YEARS the Defendant CNMCF Los Lunas Prison and Defendant Warden Jose Romero NEVER DID ANYTHING . . . Plaintiff was totally deaf in a silent world, and this injury was systematic for three years . . .")). However, Casanova's claim that he had no

access to a hearing aid after June of 2005 is belied by a grievance he filed in October, 2006, where he states that "the scratchy, irritating noise in my poor hearing aid persists." (*Id.* at 35).

In October of 2006, Warden Jose Romero left CNMCF and Robert Ulibarri became the new warden of the facility. (Doc. 51 at 5, 34). Casanova's troubles with Warden Ulibarri began soon after Ulibarri came to CNMCF. On November 6, 2006, Officer Garcia searched Casanova's belongings and found an amount of a tobacco-like substance in the bag that housed Casanova's Continuous Positive Air Pressure machine ('CPAP' machine). (Doc. 1 at 2; Doc. 51 at 42-44). As a result of the tobacco infraction, Warden Ulibarri directed that Casanova be taken out of the Geriatric Unit and placed in segregation. (Doc. 1 at 2; Doc. 53-3 at 3).

Mr. Casanova was held in the segregation unit of CNMCF for thirty-six days while the prison administration investigated the discovery of the tobacco products in his CPAP bag. (Doc. 1 at 7; Doc. 51 at 42). Casanova claims that the administration did not follow proper procedures for placing an inmate in segregation. (Doc. 1 at 2; Doc. 53-15 at 10-11). He states that possession of tobacco products does not warrant placement in segregation under prison rules and that he was not provided an opportunity to attend any hearing regarding the violation. (Doc. 1 at 2; Doc. 53-15 at 10-11). Casanova states that prison rules require the warden to review and approve any segregation placement that lasts more than thirty days and that Warden Ulibarri never undertook such a review. (Doc. 1 at 2). He further alleges that the administration ultimately dropped all charges relating to the tobacco products, but that he continued to be held in segregation for over a week following that decision. (Doc. 1 at 3; Doc. 53-9 at 3).

-4-

Mr. Casanova also claims that the Warden deliberately withheld needed medication and medical equipment from him during his time in segregation. (Doc. 1 at 2-4, 7-8). Casanova claims that he was not given his CPAP machine, which he needs to treat his sleep apnea. (*Id.* at 2-3). He further claims that he was not provided with his glasses, hearing aid, dentures, or orthopedic shoes. (Doc. 1 at 2-4; 7). The complaint also states that Warden Ulibarri prevented him from receiving any medical appointments for two weeks while he was in segregation and that the Warden similarly restricted his access to his prescription medications. (Doc. 1 at 2, Doc. 53-15 at 11).

Mr. Casanova claims that his placement in segregation caused him substantial harm. He states that the deprivation of his CPAP machine was most disruptive, since he needs the machine to treat "severe obstructive sleep apnea." (Doc. 1 at 7). He claims that his physical and mental health deteriorated during his time in segregation and that, as a result, he was hospitalized for eleven months following his discharge from CNMCF. (*Id.* at 8). Mr. Casanova was released from CNCMF on March 29, 2007. (Doc. 51 at 37).

### b.      Procedural Posture

Plaintiff has filed three different lawsuits against various defendants, all of which allege abuses during his incarceration at CNMCF. A short review of the procedural posture of this case is appropriate.

Plaintiff first filed suit against former Warden Jose Romero in March of 2008. *See* Civ. 08-287 JCH/WDS ('Casanova I'). Plaintiff also filed suit against former Warden Ulibarri in March of 2008. *See* Civ. 08-288 BB/CEG ('Casanova II'). The complaint in Casanova I substantially mirrors the claims in Casanova's most recent case - Civ. 09-1121 BB/CG ('Casanova III'). (*See* Civ. 09-1121, Doc. 1 at 10-11 (stating that Casanova III involves the

"same facts" as Casanova I)).

The Casanova I case did not proceed quickly to the service and answer stage for a number of reasons. (Civ. 08-287, Doc. 5 at 4). Service of process by the United States Marshal service was not ordered until October of 2009. (Civ. 08-287, Doc. 27). Mr. Casanova became frustrated with the slow process and he filed a motion requesting that the Court "close the case" so that he could file a new complaint. (Civ. 08-287, Doc. 28). United States District Judge Judith Herrera granted Casanova's request and dismissed the case without prejudice. (Civ. 08-287, Doc. 30). Casanova then filed Casanova III in November of 2009. (Civ. 09-1121, Doc. 1). As stated above, Casanova III substantially tracks the allegations from Casanova I, except that CNMCF and Officer Ray Garcia have been added as defendants. (*Id.*).

While Casanova I and Casanova III were proceeding, this Court recommended that Casanova II be dismissed for failure to state a claim upon which relief can be granted. (Doc. 22). United States District Judge Bruce Black adopted the recommendation and the case was dismissed. (Doc. 23). Casanova appealed this order to the Tenth Circuit, where he obtained relief. (Doc. 33); *Casanova v. Ulibarri*, 595 F.3d 1120 (10th Cir. 2010). Following the Tenth Circuit's remand, both Casanova II and Casanova III were consolidated and the *Martinez* report addressing the claims in both cases has been fully briefed.

## II.   <u>Standard of Review</u>

In the Court's Order directing submission of a *Martinez* Report, the parties were advised, pursuant to *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991), that their submissions could be used in deciding whether to grant summary judgment. (Doc. 46 at 3). Considering that the Defendants have not filed any dispositive motions since submitting

the *Martinez* report, the Court finds it appropriate to construe the report as a motion for summary judgment.

Summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact[.]" FED. R. CIV. P. 56(c)(2). The party moving for summary judgment has the initial burden of establishing, through admissible evidence in the form of depositions, answers to interrogatories, admissions, affidavits or documentary evidence, that there is an absence of evidence to support the opposing party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If this burden is met, the party opposing summary judgment must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). Affidavits or other evidence offered by the nonmoving party must create a genuine issue for trial; viewing the evidence in the light most favorable to the nonmoving party. Although all facts are construed in favor of the nonmoving party, it is still Plaintiff's responsibility to "'go beyond the pleadings' and 'designate specific facts' so as to 'make a showing sufficient to establish the existence of an element essential to [his] case' in order to survive summary judgment." *Johnson v. Mullin*, 422 F.3d 1184, 1187 (10th Cir. 2005) (quoting *Celotex,* 477 U.S. at 322).

The Court liberally construes Mr. Casanova's filings because he is a *pro se* plaintiff. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). Nevertheless, a *pro se* non-moving party must still "identify specific facts that show the existence of a genuine issue of material fact." *Munoz v. St. Mary-Corwin Hospital,* 221 F.3d 1160, 1164 (10th Cir. 2000). Conclusory allegations are insufficient to establish an issue of fact that would defeat the motion.

Additionally, in a summary judgment posture, the verified Complaint and the *Martinez* Report may be treated as affidavits. *Hall,* 935 F.2d at 1111.

**III.    Analysis**

      **a.    Warden Ulibarri is Not Entitled to Summary Judgment**

Mr. Casanova has sued former Warden Ulibarri in his unofficial capacity, claiming that his placement in segregation was "atypical" and a "hardship" and that Ulibarri did not follow CNMCF procedure when confining Casanova to segregation. (Doc. 1 at 2, 7; Doc. 53-15 at 10-11). Casanova also claims that Ulibarri was deliberately indifferent to Casanova's serious medical needs while Casanova was in segregation. (Doc. 1 at 2-4, 7-8). Warden Ulibarri purportedly prevented him from receiving visits from medical staff and restricted his access to necessary medical equipment and prescription medications. (Doc. 1 at 2-4, 7-8; Doc. 53-15 at 11).

Defendant contends that he is entitled to summary judgment because Casanova failed to exhaust his administrative remedies, as required by the Prison Litigation Reform Act ('PLRA'). (Doc, 51 at 5-7); 42 U.S.C. § 1997e(a). Defendant further argues that Casanova has failed to show that Ulibarri was personally responsible for any of the violations identified in the Complaint. (Doc. 51 at 4-5). Defendant suggests that Casanova is impermissibly attempting to hold Ulibarri liable under a *respondeat superior* theory. (*Id.*). For the reasons set forth below, the Court finds that Defendant is not entitled to summary judgment.

      **i. Casanova's Failure to Exhaust Administrative Remedies is Immaterial**

Pursuant to the PLRA, prisoners must exhaust all administrative remedies provided by the prison where they are incarcerated before bringing a lawsuit. 42 U.S.C. § 1997e(a);

*Woodford v. Ngo*, 548 U.S. 81, 93-94 (2006); *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002). In order to exhaust administrative remedies, a prisoner must properly complete the entire administrative review process that is set forth by the prison's grievance policy. *Jones v. Bock*, 549 U.S. 199, 218 (2007); *Thomas v. Parker*, 609 F.3d 1114, 1118 (10th Cir. 2010). Failure to exhaust administrative remedies is an affirmative defense. *Jones*, 549 U.S. at 216.

Ordinarily, where a prisoner fails to exhaust administrative procedures, his case must be dismissed without prejudice. *Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1139 (10th Cir. 2005). The dismissal should be without prejudice so as to afford the plaintiff an opportunity to exhaust his administrative remedies. *Woodford*, 548 U.S. at 94. However, because Casanova had been released from CNMCF when he filed his complaints, a dismissal without prejudice would not serve that purpose. Because he filed this suit after his release from CNMCF, he is not subject to the exhaustion requirement. *See Norton v. The City of Marietta, OK*, 432 F.2d 1145, 1150 (10th Cir. 2005) ("[A] plaintiff who seeks to bring suit about prison life after he has been released and is no longer a prisoner does not have to satisfy the PLRA's exhaustion requirement before bringing suit."). Therefore, even assuming that Casanova failed to exhaust his administrative remedies, such a failure will not prevent the Court from considering the merits of his claims.

### ii.    Casanova's Due Process Claims

Casanova claims that Warden Ulibarri placed him in segregation for thirty-six days without allowing him to attend any hearing regarding this placement. (Doc. 1 at 2; Doc. 53-15 at 10-11). Casanova states that prison rules require the warden to review and approve any segregation placement that lasts more than thirty days and that Warden Ulibarri never

undertook such a review. (Doc. 1 at 2). He further claims that he was held in segregation for at least a week following the prison's decision to dismiss any charges relating to the discovery of the tobacco product. (Doc. 1 at 3; Doc. 53-9 at 3).

While Casanova claims that Ulibarri's disregard for segregation procedures constitutes "cruel and unusual punishment," the Court liberally construes his Complaint as stating a due process claim asserting his right not be transferred into more restrictive conditions of confinement. "The Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Nevertheless, placement in segregation may give rise to a constitutionally protected liberty interest if the transfer "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995).

To determine whether the more restrictive confinement is atypical in relation to the ordinary incidents of prison life, the Court must determine where to place the baseline comparison. Should the conditions in segregation be compared to the conditions present in the general prison population, should it be compared to similarly restrictive custodies such as protective custody, or should it be compared to conditions faced by inmates like Casanova - i.e. elderly and infirm inmates? The Tenth Circuit has been inconsistent in applying a baseline comparison - sometimes examining similar types of restrictive conditions, while at other times comparing conditions in segregation against those in the general prison population. *Compare Gaines v. Stenseng*, 292 F.3d 1222, 1224 (10th Cir. 2002) with *Penrod v. Zavaras*, 94 F.3d, 1399, 1407 (10th Cir. 1996). Most recently, the Tenth Circuit has held that several factors should be considered in deciding whether any

given restrictive confinement might be atypical: "(1) [whether] the segregation relates to and furthers a legitimate penological interest, such as safety or rehabilitation; (2) the conditions of placement are extreme; (3) the placement increases the duration of confinement . . . [and] (4) the placement is indeterminate." *Estate of Dimarco v. Wyoming Dept. Of Corrections*, 473 F.3d 1334, 1341 (10th Cir. 2007). The Court notes that Ulibarri's failure to follow the prison regulations regarding the placement of prisoners in segregation is immaterial for the purposes of this review. It is "not the language of regulations regarding [prison] conditions *but the nature of those conditions themselves* 'in relation to the ordinary incidents of prison life'" that control due process claims." *Id.* at 1342. (emphasis in original).

In this case the Court cannot say, based up on the Complaint and the *Martinez* report, whether Casanova's time in segregation was atypical in comparison to the ordinary incidents of prison life. On the one hand, his stay in segregation was relatively short - only 36 days. *Sandin*, 515 U.S. at 486 ("Based on a comparison between inmates inside and outside disciplinary segregation, the States's actions in placing [the prisoner] there for 30 days did not work a major disruption in his environment."). On the other, Casanova alleges that he was not allowed to have shoes, a coat, glasses, soap, deodorant, or clean clothing during his time in segregation, which seems on its face to be a far harsher condition of confinement than that provided in the geriatric unit (Doc. 1 at 2-3). Regardless, because the Complaint and *Martinez* report do not shed enough light on the conditions in segregation versus the conditions in the geriatric unit, the Court cannot say summary

judgment is appropriate.[2]

Ulibarri claims that he is entitled to summary judgment because Casanova has not demonstrated that Ulibarri himself made the decision to place Casanova in segregation. (Doc. 51 at 4 ("Plaintiff would have this court believe that Ulibarri . . . deliberately directed that Plaintiff be placed in segregation and stripped of all his personal medical materials . . . [but] there is nothing that Plaintiff brings forward to show that Ulibarri actually directed or was involved in the actions that occurred.")). In response, Casanova asserts that Ulibarri personally directed that Casanova should be placed in segregation and he has attached the sworn affidavit of a fellow prisoner in the geriatric unit to support this claim. (Doc. 53 at 17; Doc. 53-3 at 3 (affidavit of inmate Jose Vazquez wherein he states "Just for [finding the tobacco,] Casanova was handcuffed in front of all the inmates, without shoes and when he asked for his air machine, the Warden said in a loud voice: "Put this man in Segregation.""")). The Court finds that Plaintiff's affidavit raises a material issue of fact with regard to whether Ulibarri ordered that Plaintiff be placed in segregation. Because there are disputed issues of material fact regarding whether Ulibarri personally placed Casanova in segregation, and whether the conditions in segregation versus those in the geriatric unit were sufficiently extreme, Ulibarri is not entitled to summary judgment.

### iii.   <u>Eighth Amendment Claims</u>

Casanova claims that Ulibarri deliberately withheld needed prescription medications

---

[2] Defendant's sole comment with regard to Casanova's due process claim is one conclusory sentence in Defendant's *Reply to Plaintiff's Response to the Court Ordered Martinez Report*, "Furthermore, Casanove [sic] offers no evidence of other inmates who were held in segregation during an investigation into contraband possession, nor does he show how his 36 day segregation was "atypical and a hardship" compared to others." (Doc. 54 at 7).

and medical equipment while he was confined in segregation. (Doc. 1 at 2-4, 7-8). Casanova alleges that he was not allowed to meet with any medical staff for two weeks while he was in segregation. (Doc. 1 at 2, Doc. 53-15 at 11). Casanova claims that these decisions constitute cruel and unusual punishment in violation of the Eighth Amendment.

Warden Ulibarri contends that he did not personally take any of the actions ascribed to him in the Complaint and that Casanova is attempting to hold Ulibarri responsible for the actions of subordinate employees. (Doc. 51 at 4). In his Reply, Ulibarri states that Casanova's complaint regarding his access to medication and equipment is more properly directed toward CNMCF's medical staff. (Doc. 54 at 6-7 (Casanova presents neither affidavit nor written order that the medical staff were directed to <u>not</u> provide any medical care to him while in segregation. This is an unsubstantiated allegation, and more, this is more appropriately directed against the medical provider.")) (emphasis in original).

To succeed on his Eighth Amendment claim, Casanova must establish that Defendant acted with "deliberate indifference to [his] serious medical needs," *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Prisoners are forced to rely on prison authorities to access medical care, and so prison authorities have an affirmative obligation to provide adequate medical care to inmates. *Ramos v. Lamm*, 83 F.3d 559, 574 (10th Cir. 1980). Because of that duty, inadequate, delayed or denied medical treatment may constitute a violation of the prisoner's Eighth Amendment rights. *Estelle*, 429 U.S. at 103. However, not all claims that a prisoner received inadequate care establish constitutional violations. *Id.* at 105. Rather, Casanova must demonstrate that the prison officials exhibited deliberate indifference to his serious medical needs. *Ramos*, 83 F.3d at 575 (citing *West v. Keve*, 571 F.2d 158, 161 (3d Cir. 1978)).

To show that prison officials were deliberately indifferent to his serious medical needs, Casanova must establish both the objective and subjective components of his Eighth Amendment claim. The objective component of a 'deliberate indifference' claim is met if the deprivation is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). "A medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (citations omitted). To prevail on the subjective component, Casanova must show "that the defendants knew he faced a substantial risk of harm and disregarded that risk . . . the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009) (internal citations omitted). Mere negligence by prison officials or medical staff will not suffice to meet the subjective prong of deliberate indifference.  *Estelle*, 429 U.S. at 105-06; *Ramos*, 639 F.2d at 575.  On the other hand, deliberate indifference may exist where officials prevent an inmate from receiving recommended treatment or deny an inmate access to medical personnel capable of evaluating the inmate for needed treatment.  *Ramos*, 639 F.2d at 575 (citing *Inmates of Allegheny Cnty. Jail v. Pearce*, 612 F.2d 754, 762 (3d Cir. 1979); *Todaro v. Ward*, 565 F.2d 48, 52 (2d Cir. 1977)).

The Court finds that Casanova has adequately alleged the objective prong of the Eighth Amendment test. Casanova claims that he was very ill when he was moved to segregation and that the decision to restrict his access to medical equipment caused his condition to deteriorate rapidly. (Doc. 1 at 1-2, 7-8). Casanova quotes from a letter written

by a treating physician - Dr. Michael Hollified - who states that

> It is essential that Mr. Casasnova have his Continuous Pressure Airway Instrument and oxygen while he is incarcerated. He has severe obstructive sleep apnea, while places him at significant risk for worsening cardiac function, cardiac disease, decreased neurological  functioning, daytime fatigue and distress, and worsening psychiatric illness if left untreated.

(Doc 1. at 7; Doc. 53-11 at 3). Casanova has also attached multiple grievances and health service request forms which he claims he filed regarding his treatment in segregation. (Doc. 53-15 at 3-9). The grievances and medical requests demonstrate that Casanova's condition worsened while he was in segregation. (*Id.* at 5-9 (*request dated 11/12/06* "I need to see a doctor. I need my pills and urgent my air mask machine, without that my life is in danger. Urgent." *request dated 11/29/06* "I am out of breath. I need my air mask machine. What happened with the [doctors]." *request dated 12/12/06* "I need my pills, request for my pills, day by day, I need to see a doctor."). Casanova further states that, as a result of his time in segregation, he was hospitalized for eleven months following his release from CNMCF. (Doc. 1 at 8). Ulibarri has not meaningfully contested any of these claims. Therefore, the Court finds that Casanova has alleged sufficient disputed material facts regarding the objective prong of the Eighth Amendment test.

With regard to the subjective prong, Mr. Casanova has alleged that Warden Ulibarri restricted his access to necessary medical equipment and that he did so with the intent of killing him. (Doc. 1 at 7-8).[3] He has attached multiple grievances against Warden Ulibarri wherein he stated that his health condition was deteriorating. (Doc. 53-15 at 2 ("This

---

[3] Casanova has suggested various explanations for why Warden Ulibarri wanted to kill him. Casanova suggests that Ulibarri put him in segregation because he was trying to protect Officer Garcia. (Doc. 1 at 8; Doc. 53-15 at 2). He also claims that prison officials wanted to kill him because he helped other inmates. (Doc. 53- 2 at 12-13).

grievance against Warden Ulibarri . . . Ulibarri put me in segregation without a hearing and without everything, my air mask machine . . . I need a hearing, and need help for my special air mask machine, I don't have enough breath.")). These allegations tend to show that Warden Ulibarri disregarded a substantial risk to Casanova's health. Furthermore, Ulibarri's decision to prevent Casanova from meeting with any medical staff for two weeks demonstrates deliberate indifference to Casanova's deteriorating health. Deliberate indifference may exist where officials deny an inmate access to medical personnel capable of evaluating the inmate for needed treatment. *Ramos*, 639 F.2d at 575 (citing *Inmates of Allegheny Cnty. Jail v. Pearce*, 612 F.2d 754, 762 (3d Cir. 1979); *Todaro v. Ward*, 565 F.2d 48, 52 (2d Cir. 1977)). These allegations, if true, would establish a violation of the Eighth Amendment.

Warden Ulibarri's sole defense is that these actions were taken by subordinate employees and that any claim regarding restrictions on medication and medical equipment are more properly directed against CNMCF's medical provider. (Doc. 51 at 4; Doc. 54 at 6-7). The Court is unpersuaded. As stated above, the party moving for summary judgment has the initial burden of establishing, through admissible evidence in the form of depositions, answers to interrogatories, admissions, affidavits or documentary evidence, that there is an absence of evidence to support the opposing party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Ulibarri has not introduced any admissible evidence demonstrating that someone other than Ulibarri put Casanova in segregation, or that some other prison official was responsible for deciding whether Casanova could have access to medication or medical equipment while in segregation. Ulibarri would have the Court speculate as to whether Ulibarri, a subordinate employee, or the medical provider was

responsible for ensuring that Casanova has access to necessary medical attention while in segregation, and this the Court cannot do. *Self v. Crum*, 439 F.3d 1227, 1235 (10th Cir. 2006) ("Summary judgment requires more than mere speculation. It requires some *evidence*, either direct or circumstantial . . .") (emphasis in original). Ulibarri has presented neither affidavits nor documentary evidence to support his argument that he was not personally involved in the violations alleged in the Complaint. Therefore, because this Court must construe all facts and inferences in favor of the non-moving party, the Court finds that Casanova has alleged sufficient disputed material facts such that Warden Ulibarri is not entitled to summary judgment.

   **b.   CNMCF, Warden Romero, and Officer Garcia are Entitled to Summary Judgment.**

         **i.   Claims Against CNMCF**

   In his Complaint, Mr. Casanova states that CNMCF failed to train and supervise its staff to prevent the abuses visited upon him by the other named defendants. (Civ. 09-1121, Doc. 1 at 3, 5-6). Casanova contends that CNMCF is a proper party to this suit because CNMCF "may be sued a person, because violated Plaintiff's Rights and should be named as <u>Defendant</u> in my lawsuit." (*Id.* at 1) (emphasis in original). However, Mr. Casanova is incorrect. CNMCF is not a legal entity separate from the state and it cannot be sued as a person. *See Aston v. Cunningham,* No. 99-4156, 2000 WL 796086 at *4 n. 3 (10th Cir. Jun.21, 2000) ("Mr. Aston named the Salt Lake County Jail as a defendant. Dismissal against this entity was . . . required because a detention facility is not a person or legally created entity capable of being sued."). The majority of federal courts which have considered the issue have determined that correctional facilities are not amenable to being

sued as individuals. *See Buchanan v. Oklahoma*, No. 09-744, 2010 WL 1449603 at *4 n.8 (W.D. Okla. March 4, 2010) (collecting cases). For that reason, CNMCF is entitled to summary judgment.

### ii.    Claims Against Warden Romero

Mr. Casanova's claims against Warden Romero fail for a number of reasons, the first being that Casanova has failed to affirmatively link Warden Romero to the alleged abuses identified in the Complaint. In his Complaint, Casanova claims that Warden Romero failed to protect him from Officer Garcia's intrusive strip searches and that he failed to discipline Officer Garcia for those searches. (Civ. 09-1121, Doc. 1 at 3, 6-7, 9). Casanova further alleges that Romero deprived him of necessary medical equipment when Romero failed to ensure that his hearing aid was returned to him in a timely manner. (*Id.* at 3, 6-7). However, it is clear from the Complaint that Casanova is attempting to hold Romero liable for these incidents under a *respondeat superior* theory. (Civ. 09-1121, Doc. 1 at 2, 6-7, 28-35).

To successfully allege a violation of his constitutional rights pursuant to 42 U.S.C. § 1983, Casanova must show that the named defendant was personally responsible for the violation. *See Foote v. Spiegel*, 118 F.3d 1416, 1423-24 (10th Cir. 1997). Liability under § 1983 may not be based solely on the theory of *respondeat superior* for the actions of staff members supervised by the named defendant. *Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996).

It is clear from the face of the Complaint that Warden Romero's 'personal involvement' with regard to the intrusive strip searches and the hearing aids is solely established by the Warden's receipt of Casanova's grievances.

-18-

> Because Defendant Warden Romero directly was involve in the wrong and was aware of the wrong when Plaintiff in person in front of all inmates' unit gave him copies of the grievances, warnings and advices about the wrong, several times, but Defendant didn't do anything to stop or fix it, when there is a duty to do so.
>
> \*\*\*\*\*
>
> Plaintiff made grievances, complaints, personal talks [about his missing hearing aid] several times with Defendant Warden Jose Romero, medical staff, nurses, etc. . . . but like always this Warden never did anything.

(Civ. 09-1121, Doc. 1 at 2, 7). The intrusive strip searches were conducted by Officer Garcia, while the hearing aids were taken for repair by a private contractor called Hearing Masters. (*Id.* at 25). Casanova has never claimed that Warden Romero personally directed either event to occur, merely that Warden Romero failed to take action following the receipt of multiple grievances. Typically, the fact that a Warden is appraised of an individual inmate's grievance is "insufficient to establish the required personal participation" under § 1983. *Whitington v. Ortiz*, 307 F.App'x 179, 192 (10th Cir. 2009) ("[T]he fact that [Plaintiff] sent a grievance or written complaint directly to the warden of a large institution would be insufficient to make the necessary link.").

Because Casanova has failed to show that Warden Romero was personally responsible for the alleged abuses, Warden Romero is entitled to summary judgment. However, the Court notes that, even if Casanova's complaint alleged a direct link between Romero and these events, he would still be entitled to summary judgment because Casanova's Complaint is untimely. The Court's analysis of the Complaint's timeliness will be addressed in the following section.

### iii.    Claims Against Officer Garcia and Warden Romero

In his Complaint, Casanova states that Officer Garcia subjected him to unnecessarily

intrusive body cavity searches. (Civ. 09-1121, Doc. 1 at 3, 8-9). He further complains that Warden Romero failed to properly supervise and discipline Officer Garcia or the contractor who took Casanova's hearing aid. (*Id.* at 6-7). However, the statute of limitations for asserting those claims against either defendant has passed. For that reason, both Officer Garcia and Warden Romero are entitled to summary judgment.

Casanova has brought this claim pursuant to 42 U.S.C. § 1983. (*Id.* at 1). The statute of limitations for claims brought under § 1983 is three years. *See, e.g.*, *Mondragon v. Thompson*, 519 F.3d 1078, 1082 (10th Cir. 2008) ("The statute of limitations for § 1983 claims in New Mexico is 3 years."). The statute of limitations begins to run when a plaintiff knows or should know that his or her constitutional rights have been violated. *Smith v. City of Enid ex rel Enid City Comm'n*, 149 F.3d 1151, 1154 (10th Cir. 1998) ("A civil rights action accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action.") (citing *Baker v. Board of Regents*, 991 F.2d 628, 632 (10th Cir. 1993)).

Casanova's claims against Officer Garcia and Warden Romero center on three strip searches that were conducted between April 25 - April 27, 2004. (Civ. 09-1121, Doc. 1 at 8). Applying the three-year statute of limitations, Plaintiff's suit would have to have been filed no later than April of 2007 for it to be considered timely. Similarly, Casanova claims that his hearing aid was removed in June of 2005. (*Id.* at 6-7, 25). Mr. Casanova and his attorney wrote multiple letters and grievances addressed to Warden Romero over the next year and a half, the last of which was sent on October 18, 2006. (*Id.* at 26-35).[4] Even

---

[4] It is no surprise that Casanova's final complaint to Warden Romero was sent in October of 2006 since that was Romero's last month as Warden of CNMCF. Robert Ulibarri took over as Warden on October 21, 2006. (Doc. 51 at 34).

assuming that the injury did not accrue until this final letter had been ignored in October of 2006, the Complaint would still be untimely since it was not filed until November 24, 2009. (*Id.* at 1).

Further, it does not appear that the statute of limitations can be tolled to save Casanova's claim. Tolling is a matter of state law. *Roberts v. Barreras*, 484 F.3d 1236, 1240-41 (10th Cir. 2007). The New Mexico Supreme Court has held that equitable tolling applies in  situations "where a litigant was prevented from filing suit because of an extraordinary event beyond his or her control." *Ocana v. American Future Co.*, 135 N.M. 539, 547 (2004). However, as noted by the *Roberts* court, equitable tolling is generally appropriate only when the plaintiff "is prevented from filing throughout the length of the statutory period. "[I]f a plaintiff discovers the injury within the time limit, [equitable tolling] does not apply because the defendant's actions have not prevented the plaintiff from filing the claim within the time period and the equitable remedy is not necessary."" *Roberts*, 484 F.3d at 1242 (citing *Tomlinson v. George*, 138 N.M. 34, 40 (2005)). There is no indication that prison staff prevented Casanova from filing a lawsuit regarding the strip search or hearing aid complaints.[5] Indeed, Casanova was released from CNMCF before the statute of limitations had lapsed on either of his claims. Therefore, there is no basis for equitably tolling the statute of limitations in Casanova's case.

---

[5] Casanova has attached several grievances where he complained that CNMCF staff were not providing him with court documents. However, a closer reading of those grievances indicate that every grievance related to attempts to obtain copies or documents in cases that had already been filed. (*See* Civ. 09-1121, Doc. 1 at 17 ("I need some copies from my state appeal and some legal paper that I will send to my attorney); *Id.* at 21 (grievance form dated 3/8/07 stating: "Please I want paperwork about Federal Civil Lawsuit."); *Id.* at 22 (response dated 3/11/07 stating "Mr. Casanova, I no longer have access to federal court case details. You will need to write the Clerk of the Court for information on your lawsuit.").

There may be a basis for statutory tolling in Casanova's case. New Mexico provides that the period of limitations for any action will be tolled if the commencement of the suit "shall be delayed by injunction order or other lawful proceeding." N.M. STAT. ANN. § 37-1-12 (1978). The *Roberts* Court indicated that the filing of mandatory administrative grievances may qualify as an "other lawful proceeding" for the purposes of New Mexico's limitations statute. However, the Court finds that, even if Casanova's attempts to follow the prison grievance process suffices to toll the statute of limitations, Casanova's claims are still untimely.

The intrusive strip searches occurred in April of 2004. Casanova claims that he filed timely grievances regarding the incidents and he has attached copies of those grievances. (Civ. 09-1121, Doc. 1 at 38-44). Casanova claims that he never received an answer or response to his complaints. (*Id.* at 37). Assuming, *arguendo*, that the grievance was properly filed and that the prison staff ignored the grievance, it would appear that the prison administration rendered the grievance process "unavailable" to Casanova.[6] Were that the case, Casanova would have been under no further duty to pursue administrative action and he would have been free to seek judicial review. *See, e.g.*, *Whitington v. Ortiz*, 472 F.3d 804, 807 (10th Cir. 2007) ("[A] prisoner cannot be required to wait indefinitely for a response to his final grievance before he may seek judicial review. That is, when prison officials fail to timely respond to a grievance, the prisoner has exhausted "available" remedies under the PLRA.") (internal citations omitted). Therefore the statute of limitations would have begun to run shortly after the filing of his grievances and the limitations period

---

[6] Defendants claim that Casanova filed no grievances during the years 2004, 2005, 2006, or 2007. (Doc. 51 at 8, 32-33).

was expired when Plaintiff filed this action, over five and a half years after the events took place.

Mr. Casanova's hearing aid was taken to be repaired in June of 2005. (Civ. 09-1121, Doc. 1 at 6-7). Casanova claims that a second hearing aid was taken from him at some unspecified time in 2005 and never returned. (*Id.* at 28-29). Casanova filed several complaints and letters regarding the missing hearing aids. (*Id.* at 26-35). Again, Casanova claims that he received no response to his grievances and letters. (*Id.*). Much as with the strip searches, if the prison administration ignored Plaintiff's grievances, then the statute of limitations would have begun to run shortly after the filing of those grievances. Indeed, Warden Romero left CNMCF in October of 2006, more than three years before Casanova commenced this action. (Doc. 51 at 34). Even if Casanova's grievances tolled the statute of limitations, such tolling would have ended no later than October of 2006, when Casanova could no longer obtain administrative relief from Warden Romero. Therefore, Casanova's attempts to make use of the grievance process cannot excuse his decision to file this suit more than four years after the events took place.

Finally, in his response to Defendants' *Martinez* report, Casanova suggests that the statute of limitations should be tolled because he was "incapacitated" during his time in CNMCF and that this incapacity was only resolved in 2008. (*See* Doc. 53-1 at 6-8). Casanova claims that,

> New Mexico has statute of limitation for incapacitated person and always give a year from and after the termination of such incapacity . . . Casanova since his release from ICE on Feb 14/08 an intensive and therapeutic time in order to increase his neurological and normal functioning . . . Plaintiffs is now no incapacitated, and the statute of limitations is not toiled [sic] because he has termination of such incapacity and this action is not premature.

(*Id.* at 8.). New Mexico does toll the statute of limitations for "incapacitated persons" and they are afforded "one year from and after the termination of such incapacity within which to commence said actions."  N.M. STAT. ANN. § 37-1-10 (1978). However, the Court is not persuaded that Casanova's incarceration at CNMCF counts as "incapacity" for purposes of the tolling statute.

Under New Mexico law, "the party claiming that the statute of limitations should be tolled has the burden of setting forth sufficient facts to support its position." *City of Carlsbad v. Grace*, 126 N.M. 95 (Ct.App.1998). Casanova has alleged throughout his various filings that he suffers from brain damage and mental disabilities such as dementia and post-traumatic stress disorder ('PTSD') (*See* Civ. 09-1121, Doc. 1 at 11; Doc. 1 at 7; Doc. 53-1 at 6-8; Doc. 53-5 at 5-6; Doc. 53-20 at 1-5). He claims that he was tortured as a political prisoner in Cuba in the 1980's, and that the strip searches and time in segregation exacerbated traumatic conditions which relate to his incarceration in Cuba. (Doc. 51-1 at 7-8). To support this assertion, Casanova cites to a June 2001 clinical evaluation performed by Dr. Michael Hollifield at the University of New Mexico Health Sciences Center. (Doc. 53-20 at 3-5).[7] Casanova also cites to documentation by Wexford Health Sources, the medical care provider at CNMCF, as well as an undated transcript of a cassette recording of a Dr. Cruz opining on Casanova's psychological reaction to incarceration. (Doc. 53-20 at 1-11).[8]

_____

[7] Dr. Hollifield's evaluation concluded that Mr. Casanova was "in the upper 5% in terms of certainty of diagnoses of PTSD and Major Depression." (Doc. 43-20 at 4). Dr. Hollifield concluded that, as a result of his experiences in Cuba, Mr. Casanova likely suffers from severe PTDS and a major anxiety disorder. (*Id.*).

[8] As reflected by the undated transcript, Dr. Cruz believes that, due to Casanova's traumatic past in Cuba, the effect of being fondled by Officer Garcia "would have a catastrophic effect. Simply catastrophic."  (Doc. 53-21 at 5). The Court notes that it has no means of determining when or by whom this transcript was made. Nor is it clear what role Dr. Cruz plays

While the Court sympathizes with Casanova's past, Casanova has not demonstrated that

he was 'incapacitated' for purposes of the statute of limitations.

At the outset, the Court notes that incarceration, without more, will not suffice to toll

the statute of limitations. *See Mosgrave c. McManus*, 24 N.M. 277 (1918) (construing a

precursor to the modern New Mexico limitations statute). Neither New Mexico, this District,

nor the Tenth Circuit has defined "incapacitated person." However, those cases where a

court has tolled the statute of limitations due to mental deficiencies have typically involved

plaintiffs who were fundamentally unable to understand the nature of the injury they had

suffered or the legal ramifications of those injures. *See, e.g.*, *Desert State Life Management

Serv. v. Ass'n of Retarded Citizens of Albuquerque,* 939 F. Supp. 835, 836 (D.N.M. 1996)

(holding that two "severely developmentally disabled [20 year old] twins  . . [who] function

at about an eighteen-month-old level" qualified as incapacitated under  N.M. STAT. ANN. §

37-1-10); *Jaramillo v. Board of Regents*, 130 N.M. 256, 256-57 (N.M. Ct. App. 2001)

(refusing to apply a hard two year statute of limitations under N.M. STAT. ANN. § 41-4-15(A)

to a two-year-old child who suffered severe brain damage as a result of negligent medical

care); *Tafoya v. Doe*, 100 N.M. 328, 331-32 (N.M. Ct. App. 1983) (refusing to apply a ninety

day notice provision under  N.M. STAT. ANN. § 41-4-16 to an eleven-month-old baby as she

was absolutely unable to comply with it). The Court finds that Casanova has not shown that

he was so incapacitated that he was unable to understand the nature of the wrongs he had

suffered or, more importantly, his right to seek  judicial review and compensation for those

wrongs.

---

with regard to Mr. Casanova's treatment.

While the documents provided by Casanova indicate that he suffers from anxiety disorders and PTSD, the mental health evaluations from his time at CNMCF indicate that Casanova was always aware of his surroundings. In a CNMCF "psychiatric encounter" form dated April 20, 2005, Mr. Casanova is listed as having normal mood, affect, speech, psychomotor level, thought content, thought process, insight, judgement, and cognitive ability. (Doc. 53-21 at 11). Another psychiatric encounter sheet dated May 25, 2005, again lists Casanova as having normal mood, affect, speech, psychomotor level, thought content, thought process, insight and judgement, and cognitive ability. (*Id.* at 9). A third psychiatric encounter sheet from June 9, 2005 echoes those same findings. (*Id.* at 8). Handwritten notes on the third psychiatric encounter sheet state that Mr. Casanova is "doing well, stable." (*Id.*).

In addition to the psychiatric reports, the voluminous documentation filed by Casanova amply demonstrates that he filed grievances and wrote letters to numerous prison officials throughout his tenure at CNMCF. The record also shows that Casanova continued to participate in pending court actions during his incarceration at CNMCF. (*See* Civ. 09-1121, Doc. 1 at 17-22 (listing various grievances and responses regarding Casanova's attempts to obtain court papers and copies to help him develop his state criminal appeal and a "Federal Civil Lawsuit.")). For those reasons, the Court finds that Casanova has not demonstrated that he was "incapacitated" pursuant to N.M. STAT. ANN. § 37-1-10 (1978). Casanova's Complaint is therefore untimely.

## IV.   Recommendation

For the reasons stated above, the Court **RECOMMENDS** that Defendants' *Martinez* report, which the Court construes as a motion for summary judgment, be **GRANTED IN**

**PART AND DENIED IN PART**. Specifically, the Court recommends that

     1) Summary Judgment be **DENIED** as to Defendant Robert Ulibarri; and

     2) Summary Judgment be **GRANTED** as to Defendants CNMCF, Ray Garcia, and

Jose Romero.

---

     **THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

---

 

_____
THE HONORABLE CARMEN E. GARZA
UNITED STATES MAGISTRATE JUDGE