# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

JORGE CASANOVA

                Plaintiff

v.                                           CIV 08-0288 BB/CG

ROBERT ULIBARRI, Warden,
CENTRAL NEW MEXICO CORRECTIONS
DEPARTMENT,
JOSE ROMERO, Former Warden,
RAY GARCIA, Correction Officer,

                Defendants.

**– AND –**

JORGE CASANOVA,

                Plaintiff,

v.                                           CIV 09-1121 BB/CG

CENTRAL NEW MEXICO CORRECTIONS
DEPARTMENT, CNMCF Los Lunas Prison,
JOSE ROMERO, Former Warden, and
RAY GARCIA, Correction Officer,

                Defendants.

## <u>PROPOSED FINDINGS AND RECOMMENDED DISPOSITION</u>

**THIS MATTER** comes before the Court upon Plaintiff Jorge Casanova's *Civil Rights*

*Complaint Pursuant to 42 U.S.C. § 1983*, (Doc. 1), filed in Civ. 08-288, *Defendant's Second*

*Court Ordered Martinez Report*, ('*Martinez* report') (Doc. 65), *Plaintiff's Response to*

*Another Martinez Report and a Respectful on Notice or Alerted to the Court*, (Doc. 66), and

*Defendant's Reply to Plaintiff's Response to the Second Court Ordered Martinez Report*,

(Doc. 67). Mr. Casanova contends that his constitutional rights were violated while he was incarcerated at the Central New Mexico Correctional Facility at Los Lunas ("CNMCF") when he was placed in administrative segregation and his access to necessary medical care was restricted. (Doc. 1 at 2). Warden Ulibarri claims that Mr. Casanova was validly segregated following a prison guard's allegation that Mr. Casanova was in possession of contraband tobacco. (Doc. 65 at 4-5). Warden Ulibarri further contends that Mr. Casanova received all appropriate medical care while in segregation. (*Id.* at 3-4). The Court construes Defendants' second *Martinez* report as a motion for summary judgment in which Defendants ask the court to dismiss Mr. Casanova's claims based on his inability to show that his constitutional rights were violated.   *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) (holding that a court may construe a *Martinez* report as a motion for summary judgment). The Court, having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, **RECOMMENDS** that Defendants' motion be **DENIED**.

## I.   Background

The factual background underlying Mr. Casanova's two complaints was detailed in this Court's *Proposed Findings and Recommended Disposition*, filed March 16, 2011. (*See* Doc. 60 at 2-6). In the proposed findings of March 16, the Court determined that Mr. Casanova's claims against Defendants CNMCF, Warden Romero and Officer Garcia were subject to dismissal. (*Id.* at 17-26). However, the Court found that the first *Martinez* report did not provide sufficient information by which to properly analyze Mr. Casanova's claims against Ulibarri. (*Id.* at 8-17). The Court therefore ordered a second *Martinez* report to determine whether several of Mr. Casanova's claims against Warden Ulibarri may proceed

to trial. Mr. Casanova has asserted two claims that remain pending against Ulibarri - a due process claim regarding his placement in segregation and an Eighth Amendment claim regarding a lack of medical care. (Doc. 1 at 2-4, 7-8). A separate Eighth Amendment claim against Ulibarri for placing Mr. Casanova with the general population of CNMCF was dismissed. (Doc. 62 at 2-5; Civ. 09-1121, Doc. 12 at 3-5).

### a.  Due Process Claim

Mr. Casanova's complaint alleges that Warden Ulibarri had him placed in administrative segregation ("AS") following an allegation that Mr. Casanova had possessed a contraband tobacco substance.(Doc. 1 at 7; *see also* Doc. 53 at 17; Doc. 53-3 at 3).[1] Mr. Casanova was held in AS for over a month between November 6 and December 11, 2006. (Doc. 1 at 7; Doc. 51 at 37). Mr. Casanova alleges that no hearing was held regarding his placement in AS, as required by the CNMCF's prison rules, and he was never given an opportunity to rebut the charges against him. (Doc. 1 at 2; Doc. 66 at 5). Mr. Casanova further alleges that he was held in AS for at least a week following the prison's decision to dismiss the charges against him. (Doc. 1 at 3; Doc. 53-9 at 3).

Defendant denies that he had any personal role in Mr. Casanova's placement in AS and he contends that the decision was made by a classification committee. (Doc. 65 at 4). Defendant explains that the placement in AS occurred after a prison guard discovered that

---

[1] While Defendant claims that Mr. Casanova was placed in "administrative segregation," the relevant disciplinary rules appended by Defendant do not mention 'administrative segregation' as a placement and instead refer to "pre-hearing detention." (Doc. 65-2 at 8). Pre-hearing detention stands in contrast to disciplinary detention, which may only be imposed upon the recommendation of a hearing officer following a hearing. (*Id.* at 7). Because the Defendants appear to view the term "administrative segregation" as interchangeable with "pre-hearing detention," the Court will do the same.

Mr. Casanova was in possession of an excessive amount of a contraband tobacco substance. (Doc. 51 at 42-43; Doc. 65 at 4). Affidavits provided by Defendant indicate that Mr. Casanova was placed in segregation on November 6 - the day the tobacco was discovered - and that he was informed on November 8 that a hearing would be held the next day regarding his placement. (Doc. 51 at 43-44). Mr. Casanova signed the form advising him that a hearing would be held on November 9. (*Id.* at 43). A hearing occurred on November 9 and Mr. Casanova was found to be a threat to the security of the prison. (*Id.* at 42). His segregation was continued pending the outcome of the investigation into the contraband. (*Id.*). Mr. Casanova's signature appears on the form, indicating that he received it, but there is no indication that he was present at the hearing or that he was permitted to testify or introduce evidence at the hearing. (*Id.*).

The record does not indicate how long the investigation took, but at some point the prison administration decided that Mr. Casanova was simply hoarding the tobacco and that he was not keeping it as contraband for inappropriate use. (Doc. 65 at 4). Defendant acknowledges that Mr. Casanova remained in segregation for some unspecified period of time following the decision to drop all charges against him. (*Id.*). The delay was attributed to the administration's effort to place Mr. Casanova back in the geriatric unit. (*Id.* at 4-5). When a bed did not open up in the geriatric unit, Mr. Casanova was transferred to the general population. (*Id.* at 5).

Mr. Casanova disputes the assertion that no beds were available in the geriatric unit. (Doc. 66 at 5). He claims that at least four rooms were vacant in the geriatric unit at the time of his release from segregation and that one of those rooms was given to an inmate who was both younger and healthier than Mr. Casanova. (*Id.*). Mr. Casanova claims that

4

another inmate in the geriatric unit named Rudy Enriquez was released from the unit on December 13, 2006, thereby refuting Warden Ulibarri's claim that no beds were available. (*Id.*). However, the letter attached from Mr. Enriquez does not support Mr. Casanova's assertion that Mr. Enriquez was released on December 13 or that there were any vacancies in the geriatric unit. The letter merely states that Mr. Enriquez never saw Mr. Casanova sell or use any tobacco products. (Doc. 66 at 49).The letter does not state if or when Mr. Enriquez was released from the geriatric unit (*Id.*).

      **b.**    **Eighth Amendment Claim**

While he was held in segregation, Mr. Casanova alleges that Warden Ulibarri deliberately withheld needed medication and medical equipment from him. (Doc. 1 at 2-4, 7-8). Most notably, Casanova claims that he was denied access to his CPAP machine, which he needs to treat his severe sleep apnea. (*Id.* at 2-3). The complaint also states that Warden Ulibarri prevented him from receiving any medical appointments for two weeks while he was in segregation and that the Warden similarly restricted his access to his prescription medications. (Doc. 1 at 2, Doc. 53-15 at 11).

Mr. Casanova claims that these deprivations caused him substantial harm. The loss of his Continuous Positive Air Pressure ("CPAP") machine is alleged to have resulted in serious heath complications, including "decreased cardiac function and severe infection in both eyes." (Doc. 53-1 at 1). In support of his claim, Mr. Casanova has attached a 2002 letter from his treating physician prior to his incarceration - Dr. Michael Hollifield - who wrote to Casanova's sentencing judge to inform him that

> It is essential that Mr. Casasnova have his Continuous Pressure Airway Instrument and oxygen while he is incarcerated. He has severe obstructive sleep apnea, which places him at significant risk for worsening cardiac function, cardiac disease,

decreased neurological functioning, daytime fatigue and distress, and worsening
psychiatric illness if left untreated.

(Doc 1. at 7; Doc. 53-11 at 3). Mr. Casanova claims that he filed multiple grievances
against Warden Ulibarri while he was held in segregation and that he made continuous
requests for medical treatment. (Doc. 53-15 at 5-9 (*request dated 11/12/06* "I need to see
a doctor. I need my pills and urgent my air mask machine, without that my life is in danger.
Urgent." *request dated 11/29/06* "I am out of breath. I need my air mask machine. What
happened with the [doctors]." *request dated 12/12/06* "I need my pills, request for my pills,
day by day, I need to see a doctor.")). Mr. Casanova asserts that his requests were
ignored.

Mr. Casanova claims that his health deteriorated during and immediately after his
time in segregation and that, as a result, he was bedridden in a hospital for eleven months
following his release from CNMCF in March of 2007. (Doc. 1 at 8; Doc. 53-1 at 1). Mr.
Casanova states that he was suffering from eye infections, breathing problems, a sleep
disorder and depression following his release from CNMCF. (Doc. 53-18 at 2).

Defendant paints a very different picture of Mr. Casanova's time in segregation.
Defendant has appended the affidavit of Doctor Steven Vaughn, the Medical Administrator
for the New Mexico Corrections Department. (Doc. 65-1 at 1-2). Dr. Vaughn states that he
reviewed Mr. Casanova's file and he states that those records "indicate that Inmate
Casanova was appropriately seen prior to being released for housing in Administrative
Segregation; his medication was appropriately administered while in Segregation, and
based on the examination conducted after his release from Segregation, there was no
indication for immediate medical care." (*Id.* at 2).

6

The medical records indicate that Mr. Casanova received a "pre-seg[gregation] evaluation" by a physician immediately prior to his placement in segregation. (*Id.* at 9). The pre-segregation checkup reflects Mr. Casanova's statement that he takes twenty-one prescription pills per day. (*Id.*). The medical records contradict Mr. Casanova's assertion that he was deprived of his medications while in segregation. Medication administration logs show that his prescription medications were renewed in November and December of 2006. (*Id.* at 1, 14-17). While the medication administration logs are not entirely clear, the initials of various nurses written into boxes denoting each day in November and December suggest that medical personnel delivered and/or administered the relevant medications to Mr. Casanova on a daily basis. (*Id.* at 14-17). However, the initials appear haphazardly, indicating that Mr. Casanova did not receive every prescribed medication every day. (*Id.*). For example, no initials appear for the majority of the listed medications for the dates December 14-20. (*Id.* at 16-17).

Defendant has also introduced a "segregation log" which, much like the medication administration log, has individual boxes denoting each day of the month. (*Id.* at 18). The log contains a legend where nurses can track the inmate's status for that day by entering one of several acronyms. (*Id.*). Mr. Casanova's log only has notations for November 15-28 and December 4-5, which accounts for approximately half of the time he spent in segregation. (*Id.*). Every notation that appears on the log states that Mr. Casanova had no complaints for that day. (*Id.*).

The medical records also indicate that Mr. Casanova received psychiatric care while in segregation. He was seen by a psychiatrist on November 8, 2006 - two days after being placed in segregation - and the psychiatric encounter report states that Mr. Casanova

displayed a great deal of anger and claimed that he did not own the tobacco which formed the basis for his detention. (*Id.*).The psychiatrist prescribed both Prozac and Vistaril for Mr. Casanova in an effort to treat his anger and anxiety. (*Id.*).[2] Mr. Casanova was seen by the same psychiatrist in February of 2007 and was again prescribed the same medications. (*Id.* at 11).

The medical records do not reflect that Mr. Casanova received any other medical care while in segregation except for a tuberculosis test administered on November 21 and a flu vaccine administered on December 9. (*Id.* at 8, 10). On December 12, 2007, one day after his release from segregation, Mr. Casanova filed a health service form in which he requested batteries for his hearing aid and stated that he needed to see a doctor due to depression and a sleeping disorder. (*Id.* at 7). Mr. Casanova then went to the prison clinic on December 22, again asking for batteries and complaining that  he felt like he needed oxygen and that he might be having a heart attack. (*Id.* at 9). The clinician noted that, notwithstanding Mr. Casanova's complaint, his blood oxygen saturation was 95% and that his breath was unlabored. (*Id.*). The clinician nevertheless scheduled Mr. Casanova to see a physician on December 24. (*Id.*). On the 24th, the physician noted that Mr. Casanova's blood oxygen saturation level was up to 97% and he refilled Mr. Casanova's prescription medications. (*Id.* at 6). Mr. Casanova also received a health physical on January 16, 2007, at which point his prescription medications were renewed once more. (*Id.* at 3-5).

---

[2] Vistaril, also known as hydroxyzine, is a cortical depressant which can be used "for symptomatic relief of anxiety and tension assocated with psychoneurosis and as an adjunct in organic disease states in which anxiety is manifested." *See* National Institute of Health definition of Vistaril*, available at http://dailymed.nlm.nih.gov/dailymed/archives/fdaDrugInfo.cfm?archiveid=14587*.

II.   **Standard of Review**

As noted in the proposed findings of March 16, 2011, the parties have been advised that the parties' submissions in the *Martinez* report could be construed as a motion for summary judgment. (Doc. 60 at 6-7);   *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991). Once again, because the Defendants have not filed any dispositive motions since submitting the *Martinez* report, the Court finds it appropriate to construe the report as a motion for summary judgment.

Summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact[.]" FED. R. CIV. P. 56(c)(2). The party moving for summary judgment has the initial burden of establishing, through admissible evidence in the form of depositions, answers to interrogatories, admissions, affidavits or documentary evidence, that there is an absence of evidence to support the opposing party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If this burden is met, the party opposing summary judgment must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). Affidavits or other evidence offered by the nonmoving party must create a genuine issue for trial; viewing the evidence in the light most favorable to the nonmoving party. Although all facts are construed in favor of the nonmoving party, it is still Plaintiff's responsibility to "'go beyond the pleadings' and 'designate specific facts' so as to 'make a showing sufficient to establish the existence of an element essential to [his] case' in order to survive summary judgment." *Johnson v. Mullin*, 422 F.3d 1184, 1187 (10th Cir. 2005) (quoting *Celotex,* 477 U.S. at 322).

The Court liberally construes Mr. Casanova's filings because he is a *pro se* plaintiff. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). Nevertheless, a *pro se* non-moving party must still "identify specific facts that show the existence of a genuine issue of material fact." *Munoz v. St. Mary-Corwin Hospital,* 221 F.3d 1160,1164 (10th Cir. 2000). Conclusory allegations are insufficient to establish an issue of fact that would defeat the motion. Additionally, in a summary judgment posture, the verified Complaint and the *Martinez* Report may be treated as affidavits. *Hall,* 935 F.2d at 1111.

### III.   Analysis

#### a.   Due Process Claims Regarding Placement in Segregation

The first issue before the Court is whether Mr. Casanova's placement in administrative segregation for over a month without giving Mr. Casanova an opportunity to rebut the charges against him rises to the level of a due process violation. The Fourteenth Amendment prohibits any State from depriving a person of life, liberty, or property without due process of law. A prisoner's liberty interest may arise either from the Due Process Clause itself or from state law. *Hewitt v. Helms*, 459 U.S. 460, 466, (1983). Generally, a prisoner has no inherent constitutional right to enjoy a particular security classification. *Templeman v. Gunter*, 16 F.3d 367, 369 (10th Cir. 1994). A prisoner's classification into segregation does not deprive an inmate of a liberty interest protected by the due process clause, nor is a hearing required. *Bailey v. Shillinger*, 828 F.2d 651, 652 (10th Cir. 1987); *Frazier v. Dubois*, 922 F.2d 560 (10th Cir. 1990). It therefore follows that prison regulations themselves are not designed to confer rights on inmates, and a prison's failure to follow the applicable regulations in placing an inmate in restrictive conditions of confinement does not

in and of itself establish a due process violation. *Sandin v. Conner*, 515 U.S. 472, 481-82 (1995). The crucial question is not whether prison officials followed the appropriate regulations, but whether the change in classification restricted the inmate's freedom in such a way as to "impos[e] atypical and significant hardships on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484; *Estate of DiMarco v. Wyoming Dept. of Corrections*, 473 F.3d 1334, 1340 (10th Cir. 2007).

Deciding whether Mr. Casanova's time in segregation was "atypical" or a "significant hardship" requires a comparison of the conditions in segregation in relation to the ordinary incidents of prison life. *Estate of DiMarco v. Wyoming Dep't of Corrections, Div. Of Prisons*, 473 F.3d 1334, 1341-42 (10th Cir. 2007). In the past, the Tenth Circuit has been somewhat inconsistent in identifying the appropriate baseline comparison when considering prisoners' due process claims. The court has, at times, compared similar restrictive conditions of confinement, such as administrative segregation versus protective custody, and it has also compared conditions in segregation against those in the general prison population. *Id.* at 1340. The Court has also identified a third baseline by comparing the conditions in segregation against those experienced by "other uniquely placed or difficult to place prisoners - i.e. ill inmates, [or] elderly inmates . . ." *Id.* at 1341-42. This third comparison seems most appropriate for Mr. Casanova's case since he was both elderly and infirm at the time he was moved from the geriatric unit to segregation.

Regardless of where the baseline is set, there is no doubt that resolution of Mr. Casanova's claims requires a comparison of the relevant conditions of confinement. The Tenth Circuit has cautioned lower courts, in the context of *sua sponte* reviews under 28 U.S.C. § 1915, that dismissal of a prisoner's *Sandin* claim is inappropriate "if [the court]

11

does not have enough sufficient evidence before it to fully address both the duration and degree of plaintiff's restrictions as compared with other inmates." *Lusero v. Walt*, 223 F.App'x 780, 783 (10th Cir. 2007) (citing *Trujillo v. Williams*, 465 F.3d 1210, 1225 (10th Cir. 2006)). While Mr. Casanova's case is before the Court on a *Martinez* report rather than a review under section 1915, the same principles apply. It was for this reason that the Court denied summary judgment in the *Proposed Findings* of March 16, 2011, noting that "the complaint and the *Martinez* report do not shed enough light on the conditions in segregation versus the conditions in the geriatric unit." (Doc. 60 at 11). In ordering Defendant to produce a second *Martinez* report, the Court directed Defendant to describe, among other things, "the conditions in the segregation unit with regard to Plaintiff's access to medical care and medical equipment, and the manner in which such conditions deviate from those present in the geriatrics unit, and in the general population." (Doc. 63 at 3).

Notwithstanding the Court's directive, it appears that Defendant has not provided any information regarding the conditions in segregation versus those in the geriatric unit or general population generally. Defendant's second *Martinez* report focuses solely on the events leading up to the decision to segregate Mr. Casanova and the rationale behind the decision to keep him segregated. (*See* Doc. 65 at 4-5). The information provided by the Defendant does not enable this Court to determine whether the conditions in segregation - conditions which Mr. Casanova claims were quite extreme as he allegedly did not have access to necessary medical care - were atypical and whether they entailed a "significant hardship." Therefore, the Court recommends that summary judgment be denied on this claim.

### b.   Eighth Amendment Claim

To succeed on his Eighth Amendment claim, Mr. Casanova must establish that Defendant acted with "deliberate indifference to [his] serious medical needs," *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Prisoners are forced to rely on prison authorities to access medical care, and so prison authorities have an affirmative obligation to provide adequate medical care to inmates. *Ramos v. Lamm*, 83 F.3d 559, 574 (10th Cir. 1980). Because of that duty, inadequate, delayed or denied medical treatment may constitute a violation of the prisoner's Eighth Amendment rights. *Estelle*, 429 U.S. at 103. However, not all claims that a prisoner received inadequate care establish constitutional violations. *Id.* at 105. Rather, Casanova must demonstrate that the prison officials exhibited deliberate indifference to his serious medical needs. *Ramos*, 83 F.3d at 575 (citing *West v. Keve*, 571 F.2d 158, 161 (3d Cir. 1978)).

To show that prison officials were deliberately indifferent to his serious medical needs, Mr. Casanova must establish both the objective and subjective components of his Eighth Amendment claim. The objective component of a 'deliberate indifference' claim is met if the deprivation is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). "A medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (citations omitted). To prevail on the subjective component, Mr. Casanova must show "that the defendants knew he faced a substantial risk of harm and disregarded that risk . . . the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

13

*Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009) (internal citations omitted). Mere negligence by prison officials or medical staff will not suffice to meet the subjective prong of deliberate indifference. *Estelle*, 429 U.S. at 105-06; *Ramos*, 639 F.2d at 575. On the other hand, deliberate indifference may exist where officials prevent an inmate from receiving recommended treatment or deny an inmate access to medical personnel capable of evaluating the inmate for needed treatment. *Ramos*, 639 F.2d at 575 (citing *Inmates of Allegheny Cnty. Jail v. Pearce*, 612 F.2d 754, 762 (3d Cir. 1979); *Todaro v. Ward*, 565 F.2d 48, 52 (2d Cir. 1977)).

### i.     **Objective Prong**

The Court finds that Mr. Casanova has satisfied the objective prong of the Eighth Amendment analysis. As noted, Mr. Casanova has alleged that his health deteriorated while he was in segregation and immediately thereafter because he did not have access to his CPAP machine and his prescription medications. As a result of this mistreatment, he states that he was hospitalized for eleven months during his subsequent incarceration at both the Regional Correctional Center ("RCC") in Albuquerque and at an Immigration and Customs Enforcement ("ICE") facility in El Paso, Texas.[3]

To support those claims, he has included a letter from Narenda Chand, a CNMCF inmate who cared for Mr. Casanova following his release from segregation. Mr. Chand states that Mr. Casanova was very ill when he was transferred to the general population. (Doc. 53-14 at 8 ("[Mr. Casanova's] eyes were swollen up, he was shivering from cold, his

---

[3] Following Mr. Casanova's release from CNCMF in March of 2007, he was detained in the "ICE Administrative Segregation unit" at the RCC. (*See, e.g.*, Doc. 53-18 at 2). Mr. Casanova was then transferred to an ICE Service Processing Center in El Paso in August of 2007 and he remained there until February of 2008. (*Id.*; Doc. 53-18 at 12).

hand was shaking very badly . . . you could see he was running out of breath. We barelly [sic] made it to our unit."). He has also included letters from fellow inmates at the RCC who state that Mr. Casanova was in very poor health when he arrived at the facility in March of 2007. (*See, e.g.*, Doc. 53-3 at 14, *letter of Edwin Cruz*, recounting that Mr. Casanova had to sleep in the hospital every night to avoid "high risk for breath[ing problems] and a severe eye's [sic] infection" and that "This poor old man came [to the RCC] with a very bad health and at that moment all of us believed that he will die very soon."); (*Id.* at 16, *letter of Angel Dorado*, stating that Mr. Casanova arrived at RCC "with infection in both eyes that he only can see a little."); (*Id.* at 19, *letter of Walfred Perez*, stating that "Mr. Jorge Casanova arrived during the first week of March 2007, nearly blind, with severe infection in both eyes, respiratory problem . . ."). He has also included medical documentation from the ICE Service Processing Center indicating that, upon his release in February of 2008, Mr. Casanova was still suffering from, among other things, blindness and low vision, and adjustment disorder with depressed mood, and obstructive sleep apnea. (*Id.* at 6-7).

Mr. Casanova's allegation that his health deteriorated during his time in segregation such that he needed to be hospitalized establishes that his injury was "sufficiently serious." As noted above,   "[a] medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (citations omitted). Mr. Casanova's allegations regarding the deterioration of his health, combined with the letters from Mr. Chand and the inmates from the RCC, demonstrate that other fellow prisoners could tell that Mr. Casanova needed medical attention. Taken in the light most favorable to Mr. Casanova, the records indicate

that he was hospitalized for almost a year following his release from CNMCF, which supports Mr. Casanova's claim that he was released in very poor health. (*See, e.g.*, Doc. 53-18 at 2, 4 (*letters from Mr. Casanova to the ICE Service Processing Center*, requesting medical records surrounding his hospitalization while at the center, indicating that he underwent eye surgery at the Service Processing Center, and stating that two of his primary treating physicians were Dr. Valerie Carrejo and Dr. Colon).

Defendant contends that the medical records identified by Dr. Vaughn show that Mr. Casanova received adequate care while he was in segregation and disputes that Mr. Casanova's health deteriorated during his detention. (Doc. 65 at 3; Doc. 67 at 5). Defendant further challenges the purported cause of Mr. Casanova's hospitalization, noting that "[a]s the medical documents provided show no pending or immediate physical needs [during and after his release from segregation], this allegation would need more support to attach this hospitalization to events that occurred while Casanova was in NMCD custody." (Doc. 65 at 6). While it is true that the cause of Mr. Casanova's hospitalization appears to be a contested question in this case, that does not mean that Defendant is entitled to summary judgment. Defendant has introduced evidence suggesting that Mr. Casanova was in relatively good health following his release from segregation. Mr. Casanova has countered by introducing multiple letters and grievances indicating that he was in far worse condition following his time in segregation than that alleged by Defendant. Because this Court must construe all facts in favor of Mr. Casanova, the Court finds that Mr. Casanova has borne his burden at the summary judgment stage and has identified disputed issues of material fact regarding the state of his health upon his release from segregation. *See, e.g. Craig v. Eberly*, 164 F.3d 490, 493 (10th Cir. 1998) (noting that summary judgment is

16

not appropriate if the nonmovant can "bring forward specific facts showing a genuine issue for trial" and stating that a genuine issue of material fact is one "such that a reasonable jury could find in favor of the nonmovant.") (citing *Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir. 1997)). Defendant himself appears to acknowledge that disputed issues of material fact remain with regard to the adequacy of Mr. Casanova's medical care. (Doc. 67 at 5 ("That the record maintained by NMCD and the medical unit does not conform to the allegations of Casanova is certainly subject to credible questioning by Casanova . . .")). Therefore, Defendant is not entitled to summary judgment on this claim.

### ii.    <u>Subjective Prong</u>

As noted above, to prevail on the subjective component of his Eighth Amendment claim, Casanova must show "that the defendant[ ] knew he faced a substantial risk of harm and disregarded that risk . . . the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009) (internal citations omitted). To support his claim that Warden Ulibarri ignored his worsening medical condition, Mr. Casanova has attached several grievances which he filed against Ulibarri while he was held in segregation. (*See, e.g.*, *grievance dated 11/6/06*, Doc. 53-15 at 2 ("This grievance against Warden Ulibarri . . . Ulibarri put me in segregation without a hearing and without everything, my air mask machine . . . I need a hearing, and need help for my special air mask machine, I don't have enough breath.))"; *grievance dated 11/6/06*, *Id.* at 3 ("This is against Warden Ulibarri in his official and personal behavior. He put me in segregation without a hearing and without my air mask machine . . .")). These grievances against Ulibarri are in addition to the numerous health request forms that Mr. Casanova

17

filed between November 6 and December 11, 2006, in which he complained that he did not have his CPAP machine or his prescription pills. (*Id.* at 5, 7-8). Kari Converse, the attorney who represented Mr. Casanova at his state trial, also contacted one of Warden Ulibarri's deputy wardens to complain that Mr. Casanova had been placed in segregation without his medical equipment. (Doc. 53-5 at 6, *letter to Deputy Warden Christine Vallejos dated 11/13/06* ("I am told that [Mr. Casanova] has been put in seg[gregation], and that all his medical equipment has been taken from him . . . [this] is nothing short of inhumane. I am requesting your immediate intervention, and that Mr. Casanova be returned his medical equipment and other property."). The grievances and letters, when taken in the light most favorable to Mr. Casanova, suggest that Warden Ulibarri was advised of Mr. Casanova's condition in segregation and that he had been denied access to necessary medical equipment.

Warden Ulibarri counters by stating that there is no proof that he or anyone else at CNMCF ever received these grievances or that they were made at all. (*See* Doc. 67 at 3 (stating that the aforementioned grievances "are presented with nothing to show that they actually were presented to NMCD staff or medical staff at the dates purported to appear on the documents. Most disturbing are Requests for Medical care that are submitted with no indication that the documents were received or acted upon.")). The Tenth Circuit has held that a prisoner who adequately alleges that prison officials ignored his grievances or prevented him from exhausting the grievance process has presented disputed issues of material fact regarding the prison's knowledge of his complaint. *See, e.g. Roberts v. Barreras*, 484 F.3d 1236, 1242-43 (10th Cir. 2007) ("We cannot agree with the district court that Mr. Roberts failed to show that he filed an administrative grievance on the issue of

18

environmental smoke. Although neither a copy of the grievance nor a response is part of

the record, Mr. Roberts submitted an affidavit describing with specificity the grievances that

he filed and the dates on which he filed them . . ."); *Baughman v. Harless*, 142 F. App'x

354, 358 (10th Cir. 2005)

> In this case, defendants provided evidence that they had never received a grievance appeal from Mr. Baughman during the relevant time period and that no entry in the prison mail logs showed that such appeals were sent. Mr. Baughman, however, presented evidence indicating that he had mailed grievance appeals. He therefore came forward with evidence showing a genuine issue of material fact on the matter for which he has the burden of proof.

*Id.*[4]

While Warden Ulibarri claims that no grievances were ever filed, Mr. Casanova

claims that his efforts to pursue the grievance process were routinely thwarted by officials

at CNMCF who would accept grievances and then subsequently ignore them. (*See, e.g.*,

Doc. 53 at 2-3; *see also* letter from Mr. Casanova's attorney, Kari Converse, who

complained to a deputy warden at CNMCF that Mr. Casanova's grievances were being

ignored, Doc. 53-5 at 6 ("Mr. Casanova reports that he filed a grievance against a guard

(dated 4-27-4), and has provided me copies of that grievance. This grievance indicates that

personally spoke with you about the situation as well . . .")). Mr. Casanova claims that the

emergency grievances against Warden Ulibarri were similarly ignored. Mr. Casanova's

situation appears analogous to that of the plaintiffs in *Barreras* and *Baughman*. In both

those cases the parties disagreed whether grievances had been properly filed and in both

cases the Tenth Circuit found that the plaintiffs had produced sufficient evidence to raise

---

[4] Unpublished decisions are not binding precedent, but they may be cited for their persuasive value. *United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005).

a disputed issue of material fact as to that question. It appears that Warden Ulibarri's knowledge of Mr. Casanova's condition in segregation is a disputed issue of fact. Therefore, the Court finds that Mr. Casanova has identified a material question as to whether Defendant Ulibarri knew that Mr. Casanova faced a substantial risk of harm while in segregation and whether he disregarded that risk.

**IV.** **Additional Issues**

Defendant's *Reply to Plaintiff's Response to the Second Court Ordered Martinez Report*, (Doc. 67), raises several ancillary issues that he feels the Court should address. First, Defendant believes that Mr. Casanova has argued in his response to the current *Martinez* report that the report was not timely filed and that Mr. Casanova is therefore entitled to a default judgment. (*Id.* at 2-3). Defendants were directed to file their *Martinez* report no later than June 13, 2011, which they did. (*See* Doc. 65) The Court finds that Defendant submitted the *Martinez* report in a timely fashion and, inasmuch as Mr. Casanova requests a default judgment, the Court recommends that the request be denied.

Defendant's counsel further complains that Mr. Casanova's filings have contained rude and disparaging remarks against both the Court and Defense counsel. (*Id.* at 2). As counsel puts it, "this most recent rambling missive filled with disparaging remarks against this court and the judges, as well as current and prior remarks against defense counsel, has moved Counsel for Defendants to ask this court to caution Casanova that . . . a pro se litigants pleadings is not a license to pepper such pleadings with rude and offensive personal opinions against the judiciary and opposing counsel." (*Id.*). There is no doubt that Mr. Casanova feels deeply about the prosecution of this case and that his efforts to obtain relief has taken longer than he would have liked. Nevertheless, even though Mr. Casanova

is proceeding pro se and therefore is due a greater degree of latitude in fashioning his pleadings, he is still expected to litigate this case in a courteous manner. Personal attacks against the Court or defense counsel are not acceptable. The Court would ask Mr. Casanova to be mindful of that in submitting future filings.

## V.   Recommendation

For the reasons outlined in the opinion, the Court **RECOMMENDS** that summary judgment be denied as to Defendant Warden Ulibarri on Mr. Casanova's Due Process and Eighth Amendment claims.

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen day period if that party wants to have appellate review of the Proposed Findings and Recommended Disposition. If no objections are filed, no appellate review will be allowed.**

---

THE HONORABLE CARMEN E. GARZA
UNITED STATES MAGISTRATE JUDGE