**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

JORGE CASANOVA

        Plaintiff,

v.                                                CIV 08-0288 JAP/CG

ROBERT ULIBARRI, Warden

        Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

**THIS MATTER** is before the Court on Plaintiff Jorge Casanova's *Civil Rights Complaint Pursuant to 42 U.S.C. § 1983* ("Complaint"), filed on March 18, 2008, (Doc. 1); *Defendant's Motion to Dismiss*, (Doc. 116), and *Defendant's Memorandum in Support of Motion to Dismiss* (collectively, "Motion to Dismiss"), (Doc. 116-1), filed on July 8, 2013; *Plaintiff's Response to Defendant's Motion to Dismiss and Defendant's Memorandum in Support of Motion to Dismiss* ("Plaintiff's Response"), filed on July 30, 2013, (Doc. 135); *Plaintiff's Supplemental Briefing – Dispositive Motion with Supporting Documentation* ("Plaintiff's Supplemental Brief"), filed on April 22, 2013, (Doc. 104); *Defendant's Reply to Plaintiff's Response to Defendant's Motion to Dismiss (Doc. 120) and Response to "Plaintiff's Supplemental Briefing Dispositive Motion with Supporting Documentation" (Doc. 104)* ("Defendant's Reply"), filed on September 6, 2013, (Doc. 136); and *Plaintiff's Reply to Defendant Reply in Reference Plaintiff's Documents 104 and Document 120* ("Plaintiff's Reply"), filed on September 23, 2013, (Doc. 140). Defendant requests that the Court grant his Motion to Dismiss, or, in the alternative, grant summary judgment based on the record developed through Defendant's *Martinez* Reports, (Docs. 51, 65).

**I.     Background**

  *a. Procedural History*

In his Complaint, Plaintiff asserted several claims against Defendant Robert Ulibarri, the warden of Central New Mexico Correctional Facility ("CNMCF").  (*See* Doc. 1).  Two of these claims remain pending against Defendant Ulibarri - a due process claim regarding Plaintiff's placement in segregation and an Eighth Amendment claim regarding a lack of medical care. (Doc. 1 at 2-4, 7-8).  A separate Eighth Amendment claim against Defendant Ulibarri for placing Plaintiff with the general population of CNMCF was dismissed on May 10, 2011. (Doc. 62 at 2-5).

On November 24, 2009, Plaintiff filed another civil rights complaint, naming CNMCF, Jose Romero, Robert Ulibarri, and Ray Garcia as defendants.  (CV 09-1121 BB/CG, Doc. 1).  On March 24, 2010, CV 09-1121 was consolidated with the instant case.  In the *Proposed Findings and Recommended Disposition* filed on March 16, 2011, this Court recommended that summary judgment be granted as to Defendants CNMCF, Garcia, and Romero, but denied as to Defendant Ulibarri.  (Doc. 60 at 27). This recommendation was adopted by United States District Judge Bruce Black on May 10, 2011.  (Doc. 62).  Plaintiff appealed the dismissal of the claims against Defendants Garcia and Romero and the Tenth Circuit affirmed the District Court.  (*See* Doc. 91-1, Order and Judgment of Tenth Circuit).

Following the submission of a second *Martinez* Report, on September 1, 2011, this Court filed its *Proposed Findings and Recommended Disposition*, (Doc. 68), in which it recommended that summary judgment be denied as to Defendant on Plaintiff's due process and Eighth Amendment claims.  (Doc. 68 at 21).  This recommendation

was adopted by Judge Black on May 9, 2012. (Doc. 76). To resolve the two pending claims against Defendant Ulibarri, this Court ordered supplemental briefing on March 26, 2013. (Doc. 99). The Court now considers these motions, their attached exhibits, and the record as a whole, in evaluating whether Plaintiff's claims should proceed to trial.

### b. Plaintiff's Claims

Plaintiff claims that Defendant did not follow proper procedures for placing an inmate in segregation. (Doc. 1 at 2; Doc. 53-15 at 10-11). He states that possession of tobacco products does not warrant placement in segregation under prison rules and that he was not provided an opportunity to attend any hearing regarding the violation. (Doc. 1 at 2; Doc. 53-15 at 10-11). Plaintiff also asserts that prison rules require the warden to review and approve any segregation placement that lasts more than thirty days and that Defendant never undertook such a review. (Doc. 1 at 2). He further alleges that the administration ultimately dropped all charges relating to the tobacco products, but that he continued to be held in segregation for over a week following that decision. (Doc. 1 at 3; Doc. 53-9 at 3).

Plaintiff's second claim is that Defendant deliberately withheld needed medication and medical equipment, including his Continuous Positive Air Pressure machine ("CPAP machine"), his glasses, hearing aid, dentures, and orthopedic shoes, from him during his time in segregation. (Doc. 1 at 2-4, 7-8). The Complaint also states that Defendant prevented Plaintiff from receiving medical appointments for two weeks while he was in segregation and that Defendant similarly restricted Plaintiff's access to his prescription medications. (Doc. 1 at 2, Doc. 53-15 at 11).

Plaintiff claims that his placement in segregation caused him substantial harm. He maintains that his physical and mental health deteriorated during his time in segregation and that, as a result, he was hospitalized for eleven months following his discharge from CNMCF on March 29, 2007. (Doc. 1 at 8; Doc. 51 at 37).

### c. Factual Background

The factual background underlying Plaintiff's Complaint was detailed in this Court's *Proposed Findings and Recommended Disposition*, filed March 16, 2011, (Doc. 60), and in a second *Proposed Findings and Recommended Disposition*, filed on September 1, 2011, (Doc. 68).  The Court repeats only the relevant, material facts here, resolving all disputed issues of fact in favor of Plaintiff, the non-moving party.

Plaintiff was incarcerated at CNMCF in Los Lunas, New Mexico, between February, 2002, and March 29, 2007. (Doc. 51 at 36-37).  In October of 2006, Defendant Robert Ulibarri became the warden of the facility. (Doc. 51 at 5, 34). On November 6, 2006, Corrections Officer Ray Garcia, under the supervision of Defendant, searched Plaintiff's belongings and found an amount of a tobacco-like substance in the bag that housed Plaintiff's CPAP machine. (Doc. 1 at 2; Doc. 51 at 42-44). As a result of the tobacco infraction, Defendant directed that Plaintiff be taken out of the Geriatric Unit and placed in segregation. (Doc. 1 at 2; Doc. 53-3 at 3).

Plaintiff was held in the segregation unit of CNMCF from November 6, 2006 until December 11, 2006, a total of thirty-five days, while the prison administration investigated the discovery of the tobacco products in his CPAP bag. (Doc. 1 at 7; Doc. 51 at 42).  On November 8, 2006, Plaintiff was informed that a hearing would take place on November 9, 2006.  (Doc. 51 at 43-44).  The hearing occurred as scheduled and

Plaintiff was found to be a threat to the security of the prison. (Doc. 51 at 42). His segregation was continued pending the outcome of the investigation into the contraband. (Doc. 51 at 42).  The record does not indicate how long the investigation took, but at some point the prison administration decided that Plaintiff was simply hoarding the tobacco and that he was not keeping it as contraband for inappropriate use. (Doc. 65 at 4).  Plaintiff was transferred to the general population on December 11, 2006.  (Doc. 136-1 at 24).

Plaintiff submitted to the Court a few grievance forms that are dated from the time he was in segregation; however, these forms contain no markings indicating that the prison received them.  (Doc. 104-2 at 21; Doc. 104-3 at 4).[1]   On these forms, Plaintiff states that he does not have his medical equipment or medication and that Defendant is acting with deliberate indifference.  (Doc. 104-2 at 21; Doc. 104-3 at 4). Ralph Casaus, the Grievance Coordinator at the New Mexico Corrections Department, states that Plaintiff did not file any grievances after 2003.  (Doc. 51 at 33).

Plaintiff also wrote a letter to Joe Williams, the Secretary of Corrections, dated November 24, 2006 and November 27, 2006, in which he requests that Mr. Williams visit him in segregation and witness Plaintiff accuse Defendant of trying to kill him; in this letter, Plaintiff also states that he needs his air machine.  (104-3 at 6-7).  In an unaddressed and undated letter submitted to the Court by Plaintiff, he states that he

---

[1] These documents were submitted by Plaintiff and not as part of the *Martinez* Reports filed by Defendant. The form contains blanks in which the inmate can provide the date of the grievance, the date of the incident, identify the individual against whom he is filing the grievance, and provide details regarding the actual incident.  Each form contains blanks for the signature of the grievance officer and the date on which the grievance was received.  There is also a section in which the grievance officer indicates what kind of action will be taken on the grievance (e.g., whether the grievance is accepted for consideration, whether the grievance was returned to the inmate because it was illegible, etc.).  None of the grievances that Plaintiff submitted to the Court have any notations or signatures in the blanks meant to be completed by grievance officers.  (*See* Doc 104-2 at 21; Doc. 104-3 at 4).

filed an informal complaint in January 2007 via "ordinary mail" and never received a response. (Doc. 104-4 at 14-17).

On November 13, 2006, Plaintiff's attorney, Kari Converse, wrote a letter to Deputy Warden Christine Vallejos, in which she explained that she had been informed that Plaintiff did not have his medical equipment while he was in segregation. (Doc. 104-3 at 8). Ms. Converse also wrote to Defendant, on December 12, 2006, to express her concern that Plaintiff had been moved to the general population unit. (Doc. 104-3 at 9). Although the letter mentions that Plaintiff suffers from dementia, it contains no information regarding his medical care during his time in segregation, and further notes that she had not been able to reach Defendant in her previous attempts to contact him via telephone. (Doc. 104-3 at 9). On December 20, 2006, Ms. Converse wrote to Judge Carl Butkus, a district court judge in Bernalillo County District Court. (Doc. 104-3 at 11-12). In her letter, Ms. Converse stated that Plaintiff has been placed in segregation without his medical equipment or personal belongings, but the portion of the letter that was submitted to the Court does not mention Defendant.

The medical records indicate that Plaintiff received a "pre-seg[regation] evaluation" by a physician immediately prior to his placement in segregation. (Doc. 65-1 at 9). The pre-segregation checkup reflects Plaintiff's statement that he takes twenty-one prescription pills per day. (Doc. 65-1 at 9). Medication administration logs show that his prescription medications were renewed in November and December of 2006. (Doc. 65-1 at 1, 14-17). While the medication administration logs are not entirely clear, the initials of various nurses written into boxes denoting each day in November and December suggest that medical personnel delivered and/or administered medication to

6

Plaintiff on a daily basis. (Doc. 65-1 at 14-17). However, the initials appear haphazardly, and it is possible that Plaintiff did not receive every prescribed medication every day. (Doc. 65-1 at 14-17).

Although inmates in segregation receive fewer visits from medical personnel than those placed in the geriatric unit, nursing staff walks through the segregation unit at least twice a day and collects health service requests forms at least daily. (Doc. 136-1 at 10-11). The "segregation log," like the medication administration log, has individual boxes denoting each day of the month. (Doc. 65-1 at 18). The nurse who completed the log noted that Plaintiff did not have any complaints on any day between November 15, 2006 and November 28, 2006, or on December 4-5, 2006. (Doc. 65-1 at 18). There are no notations from November 6, 2006 through November 14, 2006, between November 28, 2006 and December 3, 2006, or from December 6, 2006 until Plaintiff was transferred to the general populations unit on December 11, 2006. (Doc. 65-1 at 18).

Plaintiff saw a psychiatrist on November 8, 2006; the psychiatric encounter report from that visit states that Plaintiff displayed a great deal of anger and claimed that he did not own the tobacco which formed the basis for his detention. (Doc. 65-1 at 12). The psychiatrist prescribed both Prozac and Vistaril for Plaintiff in an effort to treat his anger and anxiety. (Doc. 65-1 at 12).[2] Plaintiff saw the same psychiatrist on February 5, 2007, and was again prescribed the same medications. (Doc. 65-1 at 11).

---

[2] Vistaril, also known as hydroxyzine, is a cortical depressant which can be used "for symptomatic relief of anxiety and tension assocated with psychoneurosis and as an adjunct in organic disease states in which anxiety is manifested." See National Institute of Health definition of Vistaril, available at http://dailymed.nlm.nih.gov/dailymed/archives/fdaDrugInfo.cfm?archiveid=14587.

While in segregation, Plaintiff received a tuberculosis test administered on November 21, 2006, and read by medical personnel on November 24, 2006, and a flu vaccine administered on December 9, 2006. (*Id.* at 8, 10). Plaintiff filled out health service request forms on November 12, 16, and 29, 2006, in which he stated that he needed his CPAP machine and medication, but there is no notation on these forms indicating that medical personnel, or any other prison official, received them. (Doc. 104-3 at 1-3).[3]

On December 12, 2007, one day after his release from segregation, Plaintiff filed a health service form in which he requested batteries for his hearing aid and stated that he needed to see a doctor due to depression and a sleeping disorder. (Doc. 65-1 at 7). Plaintiff went to the prison clinic on December 22, 2006, again requesting batteries and complaining that he felt like he needed oxygen and that he might be having a heart attack. (Doc. 65-1 at 9). The clinician noted that, notwithstanding Plaintiff's complaint, his blood oxygen saturation was 95% and that his breathing was unlabored. (Doc. 65-1 at 9). The clinician nevertheless scheduled an appointment for Plaintiff to see a physician on December 24, 2006. (*Id.*). On the 24th, the physician noted that Plaintiff's blood oxygen saturation level was up to 97% and he refilled Plaintiff's prescription medications. (Doc. 65-1 at 6). On January 16, 2007, Plaintiff received a health physical, at which point his prescription medications were renewed once more. (Doc. 65-1 at 3-5).

## II. Standard of Review

The court shall grant summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as

---

[3] Much like the grievance forms, the health service request forms contain a section in which a medical provider documents the action taken in response to the request. These sections are entirely blank on each health service request form submitted to the Court by Plaintiff. (*See* Doc. 104-3 at 1-3).

a matter of law." FED. R. CIV. P. 56(a).  A fact is material if it might affect the outcome of the case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue is genuine if the evidence is such that a reasonable jury could resolve the issue in favor of the nonmoving party. *Id.*  The movant bears the burden of making a *prima facie* demonstration that there is no genuine issue of material fact. *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670–71 (10th Cir.1998) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)).

If the moving party has demonstrated an absence of an issue of material fact, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587(1986) (internal quotations omitted). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson,* 477 U.S. at 249.  The nonmovant must go beyond the allegations and denials of his pleadings and provide admissible evidence, which the Court views in the light most favorable to him. *Panis v. Mission Hills Bank, N.A.,* 60 F.3d 1486, 1490 (10th Cir.1995).

The purpose of a *Martinez* Report is to "develop a record sufficient to ascertain whether there are any factual or legal bases for the prisoner's claims." *Hall v. Bellmon,* 935 F.2d 1106, 1109 (10th Cir. 1991).  "On summary judgment, a *Martinez* report is treated like an affidavit, and the court is not authorized to accept its fact findings if the prisoner has presented conflicting evidence." *Northington v. Jackson,* 973 F.2d 1518, 1521 (10th Cir.1992).  A plaintiff's complaint may also be treated as an affidavit if it


alleges facts based on the plaintiff's personal knowledge and is sworn under penalty of perjury.  *Hall*, 935 F.2d at 1111.

The Court is mindful that it must construe the filings of a *pro se* litigant liberally. *See id. at* 1110. However, the Court should not be a *pro se* litigant's advocate.  *Id.*  In addition, Plaintiff, as a *pro se* litigant, must follow the same procedural rules that govern other litigants. *Nielson v. Price,* 17 F.3d 1276, 1277 (10th Cir.1994).

### III.     Analysis

Plaintiff has sued former Defendant in his individual capacity, claiming that his placement in segregation was "atypical" and a "hardship" and that Defendant did not follow CNMCF procedure when confining Plaintiff to segregation. (Doc. 1 at 2, 7; Doc. 104 at 4-11). He also claims that Defendant was deliberately indifferent to Plaintiff's serious medical needs while he was in segregation. (Doc. 1 at 2-4, 7-8).

#### a. *Due Process Claims*

Plaintiff claims that Defendant violated his due process rights by placing him in segregation for thirty-five days without allowing him to attend any hearing regarding this placement. (Doc. 1 at 2; Doc. 104 at 4-11). He also states that prison rules require the warden to review and approve any segregation placement that lasts more than thirty days and that Defendant never undertook such a review. (Doc. 1 at 2).  Defendant argues that the conditions Plaintiff experienced in segregation are not the type of atypical, significant deprivation that would implicate a constitutionally protected liberty interest.  (Doc. 136 at 9-14).

The Fourteenth Amendment prohibits any State from depriving a person of life, liberty, or property without due process of law.  U.S.Const. amend. XIV.  A prisoner's

liberty interest may arise either from the Due Process Clause itself or from state law. *Hewitt v. Helms*, 459 U.S. 460, 466, (1983).  Incarcerated individuals "retain only a narrow range of protected liberty interests," and not all deprivations of liberty in the prison context involve a constitutional dimension.  *Rezaq v. Nalley*, 677 F.3d 1001, 1011 (10th Cir. 2012) (internal quotations omitted).

Generally, a prisoner has no inherent constitutional right to enjoy a particular security classification. *Templeman v. Gunter*, 16 F.3d 367, 369 (10th Cir. 1994).  "[T]he Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement."  *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).  It therefore follows that prison regulations themselves are not designed to confer rights on inmates, and a prison's failure to follow the applicable regulations in placing an inmate in restrictive conditions of confinement does not in and of itself establish a due process violation. *Sandin v. Conner*, 515 U.S. 472, 481-82 (1995). "A protected liberty interest only arises from a transfer to harsher conditions when an inmate faces an 'atypical and significant hardship in relation to the ordinary incidents of prison life.' " *Rezaq*, 677 F.3d at 1011 (quoting *Wilkinson*, 545 U.S. at 221).

In *Estate of DiMarco v. Wyoming Dept. of Corrections*, 473 F.3d 1334 (10th Cir. 2007), the Tenth Circuit identified four factors that courts may consider in determining whether an inmate's liberty interest is implicated.  These factors are: "(1) [whether] the segregation relates to and furthers a legitimate penological interest, such as safety or rehabilitation; (2) the conditions of placement are extreme; (3) the placement increases the duration of confinement . . . [and] (4) the placement is indeterminate." *Estate of DiMarco*, 473 F.3d at 1341.  Although no single factor is necessarily attributed more or

11

less weight than any other factor, the Supreme Court has previously "placed the weight of its analysis on the indeterminate duration of confinement and the effect the placement had on an inmate's parole eligibility." *Rezaq*, 677 F.3d at 1012-13 (citing Wilkinson, 545 U.S. at 214). In *Rezaq*, the Tenth Circuit "read *Wilkinson* to say that extreme conditions in administrative segregation do not, on their own, constitute an 'atypical and significant hardship' when compared to the 'ordinary incidents of prison life.'" *Rezaq*, 677 F.3d 1013 (quoting *Sandin*, 515 U.S. at 484).

The Court notes that Defendant's alleged failure to follow the prison regulations regarding the placement of prisoners in segregation is immaterial for the purposes of this review. It is "not the language of regulations regarding [prison] conditions *but the nature of those conditions themselves* in relation to the ordinary incidents of prison life that control due process claims." *Estate of DiMarco,* at 1342. (emphasis in original) (internal quotations omitted).

In this case, the Court must analyze the facts in light of the four factors outlined in *Estate of DiMarco* to determine whether Plaintiff's liberty interests were implicated by his placement in segregation for thirty-five days. As to the first factor, Plaintiff was initially placed in segregation after prison officials discovered a tobacco-like substance in amongst his belongings, pending an investigation as to exactly what the substance was, and to what extent the possession of this substance was in violation of prison regulations. This represents a legitimate penological interest of the kind contemplated in *Estate of DiMarco*.

Plaintiff's claims that he was denied medical care is relevant to the second factor, whether the conditions in segregation were extreme. Although Plaintiff has alleged that

he was denied medical care throughout his time in segregation, the medical records do not necessarily support this contention. The medical records demonstrate that he received his prescription medication, did not voice any complaints to medical personnel for the majority of his time in segregation, and was seen by medical personnel on at least four occasions (a psychiatric visit, the administration and assessment of his tuberculosis test, and the administration of a flu vaccine). Defendant has submitted an affidavit from Mark Delgado, the Health Services Administrator for CNMCF explaining that health services are provided based on the individual inmate's need, regardless of his housing area or custody level. While it appears that while in segregation, Plaintiff would have had less freedom to access medical care on his own than he had while placed in the geriatric unit, the conditions of the segregation unit are not, on their face, extreme. Inmates in segregation at CNMCF received medical care according to their needs, medical personnel collected health service requests on a daily basis, and walked through the unit twice a day to check on the inmates. These facts do not suggest that the conditions in segregation were extreme and resulted in a lack of medical care.

Plaintiff has also alleged that his medical equipment was kept from him while he was in segregation. This allegation, if true, does suggest that Plaintiff's own experience in segregation was quite difficult and uncomfortable. However, this particular claim is more properly characterized as an Eighth Amendment claim against the medical personnel overseeing Plaintiff's medical care during his time in segregation. See *Riddle v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir. 1996) (noting that, when a prisoner asserts claims under the Eighth and Fourteenth Amendment due to inadequate medical care, the Court should review the claims solely under the Eighth Amendment). As

stated above, there was no systemic denial of medical care in the unit, and Plaintiff's complaint that he was denied access to his television is not grounds for finding that the conditions were extreme. *See Rezaq*, 677 F.3d at 1014-15 (finding that conditions in prison, though "undeniably harsh," did not, "in and of themselves, give rise to a liberty interest because they are substantially similar to conditions experienced in any solitary confinement setting.")

The third factor outlined in *Estate of DiMarco* is whether the placement in segregation extends the duration of confinement. As Defendant points out, Plaintiff received all of his good time credit for the time he was in segregation. (Doc. 136 at 31). Plaintiff was released from prison less than four months after he was transferred out of segregation, and he does not allege that his time in segregation increased his time in prison.

As to whether Plaintiff's placement in segregation was indeterminate, the fourth factor discussed in *Estate of DiMarco*, Plaintiff was transferred into the general population unit after thirty-five days. Although the duration of segregated confinement can itself be atypical and significant, thirty-five days would not be considered so significant as to give rise to a protected liberty interest. (*See Estate of DiMarco*, 473 F.3d at 1341 n.5 for a list of cases in which the Tenth Circuit found that confinement for periods of time significantly exceeding a placement of thirty-five days did not violate an established liberty interest.) Plaintiff also argues that Defendant failed to review his placement in segregation after thirty days, as required by prison policy. Although periodic review of an inmate's placement is an important consideration in the analysis of the fourth factor, here Plaintiff asserts only a delay of five days between when the

review should have happened and when he was transferred out of segregation. This does not support his claim that Defendant violated his due process rights.

Based on the above analysis of the facts in light of the four factors outlined in *Estate of DiMarco*, this Court recommends that Plaintiff's due process claims be dismissed. Plaintiff's placement in segregation was related to a legitimate penological interest, was not excessively long, and was not indeterminate. Although the conditions were harsh, and it does appear that Plaintiff suffered some physical distress as a result of his placement, the conditions of the segregation unit, in and of themselves, were not extreme.

### b. Eighth Amendment Claims

Plaintiff claims that Defendant deliberately withheld Plaintiff's necessary prescription medications and medical equipment while he was confined in segregation, in violation of the Eighth Amendment. (Doc. 1 at 2-4, 7-8). Defendant maintains that Plaintiff has failed to demonstrate that his medical needs were sufficiently serious or that Defendant knew of and disregarded an excessive risk to Plaintiff's health. (Doc. 136 at 2-9).

To succeed on an Eighth Amendment claim, a plaintiff must establish that the defendant acted with "deliberate indifference to [his] serious medical needs," *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Prisoners are forced to rely on prison authorities to access medical care, and so prison authorities have an affirmative obligation to provide adequate medical care to inmates. *Ramos v. Lamm*, 83 F.3d 559, 574 (10th Cir. 1980). Because of that duty, inadequate, delayed or denied medical treatment may constitute a violation of the prisoner's Eighth Amendment rights. *Estelle*, 429 U.S. at 103. However,

15

not all claims that a prisoner received inadequate care establish constitutional violations. *Id.* at 105.

To show that prison officials were deliberately indifferent to his serious medical needs, a plaintiff must establish both the objective and subjective components of his Eighth Amendment claim. The objective component of a 'deliberate indifference' claim is met if the deprivation is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). To prevail on the subjective component, the plaintiff must show "that the defendants knew he faced a substantial risk of harm and disregarded that risk . . . the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009) (internal citations omitted). Mere negligence by prison officials or medical staff will not suffice to meet the subjective prong of deliberate indifference. *Estelle*, 429 U.S. at 105-06; *Ramos*, 639 F.2d at 575. On the other hand, deliberate indifference may exist where officials prevent an inmate from receiving recommended treatment or deny an inmate access to medical personnel capable of evaluating the inmate for needed treatment. *Ramos*, 639 F.2d at 575 (citing *Inmates of Allegheny Cnty. Jail v. Pearce*, 612 F.2d 754, 762 (3d Cir. 1979); *Todaro v. Ward*, 565 F.2d 48, 52 (2d Cir. 1977)).

To succeed on his claim that Defendant was deliberately indifferent, Plaintiff must show that Defendant knew of, and disregarded, a serious risk to his health or safety. To that end, Plaintiff directs the Court to review the various grievances, health service requests, letters from his attorney to prison officials, and affidavits from other prisoners. (Doc. 104 at 11-20). However, none of these documents demonstrate that Defendant

was aware that Plaintiff was not receiving medical care and was without his medical equipment while in segregation. Although the grievances mention Defendant by name, the grievances themselves, and the health service request forms filled out and submitted to the Court by Plaintiff do not contain any notations from prison officials that would support an inference that they were ever submitted to the prison. The letter to Defendant from Plaintiff's attorney was dated the day after Plaintiff was transferred out of segregation. Although Plaintiff's attorney did write a letter to the deputy warden while Plaintiff was in segregation, Plaintiff has not offered any evidence to show that the information in that letter was conveyed to Defendant.

Plaintiff asserts that because Defendant specifically directed that Plaintiff be transferred to segregation from the geriatric unit, which is "for elderly and sick inmates," that he would have known and disregarded a risk to Plaintiff's health or safety. (Doc. 104 at 16). However, as discussed above, inmates who were placed in the segregation unit did receive medical care according to their needs and the placement of Plaintiff in segregation does not demonstrate disregard of an excessive risk to Plaintiff's health or safety. Moreover, Defendant has provided a sworn affidavit in which he states that he was not informed of any concerns regarding an inmate's medical care in the segregation unit in November or December 2006. (Doc. 136-1 at 13-14).

Although the Court understands that Plaintiff has had numerous problems with his health, including some that may have been exacerbated by his time in segregation, Plaintiff has not submitted any evidence that demonstrates a genuine issue of material fact as to whether Defendant was aware of Plaintiff's medical care (or lack thereof) while he was placed in segregation. Conclusory allegations, grievances that were not

submitted, and affidavits from other inmates as to his health after his time in segregation do not provide evidence that Defendant had knowledge of Plaintiff's medical needs. Therefore, the Court recommends that Plaintiff's Eighth Amendment claims against Defendant be dismissed.

### IV.     Conclusion

For the reasons outlined above, the Court finds that there are no disputed issues of material fact which would preclude the Court from entering judgment in Defendant's favor on all claims asserted against him. The Court **RECOMMENDS** that *Defendants' Motion to Dismiss*, (Doc. 116), and *Defendant's Memorandum in Support of Motion to Dismiss* (collectively, "Motion to Dismiss"), (Doc. 116-1), construed as a Motion for Summary Judgment, be **GRANTED** and that all claims against Defendant Robert Ulibarri be **DISMISSED WITH PREJUDICE**.

> **THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

_____
THE HONORABLE CARMEN E. GARZA
UNITED STATES MAGISTRATE JUDGE